Appeal of **C. S. WEBB, INC.**              **Docket No. 396.**

Unless usual and reasonable means have been used and exhausted in unsuccessful attempts to collect amounts due it a corporate taxpayer may not deduct such amounts from its taxable income for the year during which it wrote them off its books as bad debts.

An amount distributed as dividends and later returned to the corporation by the stockholders may not be included in invested capital from the date of the payment of the dividend to the date of its repayment to the corporation.

Submitted December 8, 1924; decided January 8, 1925.

*Paul F. Myers, Esq.*, for the taxpayer.

*A. Calder Mackay, Esq.* (Nelson T. Hartson, Solicitor of Internal Revenue) for the Commissioner.

BEFORE GRAUPNER, LANSDON, LITTLETON, and SMITH.

FINDINGS OF FACT.

1. The taxpayer is a South Carolina corporation engaged in the cotton brokerage business in Greenville, S. C., where its principal office is located. During the fiscal year ended June 30, 1919, the taxpayer's corporate title was C. S. Webb, Inc.

2. Fifty per centum of the issued capital stock of the taxpayer was owned during the fiscal year in question by C. S. Webb, who was president of the corporation, resided in Greenville, S. C., and was actively engaged in the direction and management of the taxpayer's business operations. The remaining 50 per centum of the issued capital stock was owned by N. M. Weld, who resided in New York City. C. S. Webb and N. M. Weld were members of the New York Cotton Exchange.

3. During the calendar years 1918 and 1919 and all within the fiscal year of the taxpayer ended June 30, 1919, C. S. Webb and two other persons who are not named in this record, but are designated as officers of cotton mills located in South Carolina, placed a number of orders for the purchase and future delivery of cotton with C. S. Webb, Inc. Such orders were executed on the New York Cotton Exchange through Weld & Co., a firm of cotton brokers in business in the city of New York. The account so created was carried on the books of C. S. Webb, Inc., under the name of Hartzog & Co.

4. Some time after the Hartzog & Co. orders for the purchase of cotton were executed C. S. Webb became ill and was absent from Greenville, S. C., for a number of months. During such illness and absence C. S. Webb was unable to direct and manage the affairs of the taxpayer. He left no special instructions with anyone to look after the account of Hartzog & Co., which was kept open, with the result that a decline in the price of cotton caused heavy loss. The account was closed out at a net loss of $37,926.72.

5. When C. S. Webb returned to Greenville, S. C., he found that the taxpayer had paid the above-named N. M. Weld & Co. the sum of $37,926.72, the whole amount of the loss resulting from the Hartzog & Co. orders for the purchase and future delivery of cotton, and had charged the same to the Hartzog & Co. account. C. S. Webb at once asked his two associates to pay their shares of the loss. This they refused to do, alleging as their reason for such refusal that the loss had resulted from the negligence of C. S. Webb, Inc., in failing to close out the account at an earlier date.

6. After the refusal of his two associates in the Hartzog & Co. transaction to pay any part of the loss resulting therefrom C. S. Webb had a conference with N. M. Weld for the purpose of deciding what C. S. Webb, Inc., should do with the account. The cotton mills

of which Webb's associates were officers were customers of C. S. Webb, Inc., and, believing that their business would be taken elsewhere if any attempt should be made to enforce collection of the losses in the Hartzog transaction, it was decided that the taxpayer should stand the entire loss.

7. On August 28, 1918, C. S. Webb, Inc., paid out as a dividend its entire surplus as of June 30, 1918, in the amount of $23,979.32. Subsequently, auditors employed by the taxpayer asserted that this payment was in excess of the actual surplus available on June 30, 1918, to the extent of $6,688.25, which was the amount of Federal income and profits taxes accrued against the taxpayer at that date and for which no reserve had been set up on its books.

8. In order to correct its books and restore to capital the amount alleged by the auditors to have been improperly paid out as dividends, the taxpayer charged its stockholders with $6,688.25, which they paid back, with interest, after the close of the fiscal year in question. The amounts so collected were restored to capital by making the necessary readjusting entries which were prepared by an auditor some time after the close of the fiscal year ended June 30, 1919.

### DECISION.

The deficiency determined by the Commissioner is approved.

### OPINION.

LANSDON: The first question involved in this appeal is whether the taxpayer was entitled to deduct the amount of $37,926.75 from its income for the year ended June 30, 1919, as a bad debt ascertained to be worthless and written off its books in the year in question. It is the opinion of the Board that the taxpayer has failed to show that any serious effort was ever made to collect the amount in controversy. On the contrary, it is admitted that C. S. Webb, Inc., decided, for business reasons that seemed good to its stockholders, that it would not attempt to secure collection from C. S. Webb and his two associates and that it would absorb the entire loss.

The Board is of the opinion that the loss claimed by the taxpayer as a deduction from its income for the year ended June 30, 1919, could have been collected. C. S. Webb owned 50 per centum of the capital stock of the taxpayer, which was so prosperous during the year in question that it earned a net income of $102,907.75 on a capital investment of $200,331.04. It is reasonably certain that the whole debt could have been collected from C. S. Webb. The other two parties to the Hartzog transaction were business men of South Carolina, and each of them was an officer of a cotton mill. It may be that neither C. S. Webb nor either of his partners in the Hartzog transaction was able to pay all or even his proper share of the loss that is claimed by the taxpayer as a bad debt, but no evidence to that effect was adduced at the hearing before the Board.

Counsel for the taxpayer appeared to attach some importance to an allegation, supported by the opinion of an attorney, that the loss in question was uncollectible because it resulted from a transaction

alleged to be illegal under the laws of South Carolina. The Board declines to give any consideration to this contention in the absence of any evidence of illegality and since the matter was not determined by any court clothed with jurisdiction to construe the laws of South Carolina.

The second point to be determined is whether the Commissioner erred in his computation and adjustment of the taxpayer's invested capital for the year ended June 30, 1919. The payment of alleged excessive dividends was not disclosed until some time subsequent to the close of the fiscal year ended June 30, 1919. The repayments and adjusting entries were not made until after the close of that year. The stockholders had the use of the $6,688.25 which the taxpayer's auditors assert was paid to them in error on August 28, 1918, from that date until after the close of the fiscal year in question, and the taxpayer was deprived of the use of that amount of money for the same time. These are facts that it is impossible for any bookkeeping entries subsequently made to affect in any way.