DOORNBOSCH BROS., INC., ET AL.,[1] PETITIONERS, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket Nos. 5414–63—5416–63, 5427–63. Filed May 10, 1966.

*Martin M. Lore*, for the petitioners.
*Julius M. Jacobs*, for the respondent.

---

[1] Proceedings of the following petitioners are consolidated herewith: Doornbosch Bros., Inc., docket No. 5415–63; Jan Doornbosch and Ruth Doornbosch, docket No. 5416–63; and John J. Doornbosch and Vivian M. Doornbosch, docket No. 5427–63.

ARUNDELL, *Judge:* Respondent determined deficiencies in withholding tax and income tax in amounts as follows:

| Docket No. | Petitioner | Taxable year ended | Deficiency [1] |
|---|---|---|---|
| 5414-63 | Doornbosch Bros., Inc | Dec. 31, 1959<br>Dec. 31, 1960<br>Dec. 31, 1961<br>Dec. 31, 1962 | $3,027.00<br>668.00<br>48.00<br>48.00 |
| 5415-63 | ____do | June 30, 1959<br>June 30, 1960<br>June 30, 1961<br>June 30, 1962 | 11,813.15<br>12,087.13<br>12,905.69<br>11,871.17 |
| 5416-63 | Jan Doornbosch, et ux | Dec. 31, 1960<br>Dec. 31, 1961 | 1,150.40<br>216.94 |
| 5427-63 | John J. Doornbosch, et ux | Dec. 31, 1958<br>Dec. 31, 1959<br>Dec. 31, 1960<br>Dec. 31, 1961 | 67.06<br>373.58<br>669.33<br>1,414.55 |

[1] The deficiencies in docket No. 5414-63 are for withholding of income tax at source under the provisions of secs. 1441 and 1461, I.R.C. 1954. The deficiencies in the three remaining docket numbers are for income tax.

In docket No. 5414-63 petitioner alleges that the respondent erred in determining that certain alleged "commissions paid," "interest paid," and "loans repaid" by petitioner to its nonresident alien stockholders represented "dividend distributions * * * subject to withholding taxes at the rate of 15 percent as determined by Tax Treaty with the country of Netherlands, relative to dividend payments." (Note: The solution of the issues thus raised will depend largely on our disposition of the issues raised in docket No. 5415-63.)

In docket No. 5415-63 petitioner alleges that the deficiencies as determined are based upon the following errors: [2]

(a) Error in disallowing to petitioner deductions of $10,275.00, $30,319.25, $31,472.70 and $29,452.70 for purchases in fiscal 1959, 1960, 1961 and 1962, respectively.

(b) Error in disallowing to petitioner a deduction in fiscal 1959 of compensation paid to Hendrik Doornbosch and Johannes Doornbosch in the total amount of $19,700.

(c) Error in disallowing to petitioner deductions of $1,000.00, $946.68, $680.00 and $680.00 for interest in fiscal 1959, 1960, 1961 and 1962, respectively.

(d) Error in disallowing to petitioner deductions of $840.00, $973.00, $1,063.00 and $1,553.20 for travel expenses in fiscal 1959, 1960, 1961 and 1962, respectively.

In docket No. 5416-63 petitioners allege that the deficiencies as determined are based upon the following errors:

[2] In error (a), *infra*, the amounts for 1960, 1961, and 1962 are broken down in the deficiency notice into two items, as follows:

| | 1960 | 1961 | 1962 |
|---|---|---|---|
| Packing and crating | $10,405.00 | $12,956.00 | $13,328.00 |
| 6 percent handling charge | 19,914.25 | 18,516.70 | 16,124.70 |
| Total deducted as purchases | 30,319.25 | 31,472.70 | 29,452.70 |

(a) Error in disallowing to petitioners deductions of $973.00 and $535.00 for travel expense incurred in the years 1960 and 1961, respectively.

(b) Error in treating interest in the amounts of $226.67 and $160.00 received during the years 1960 and 1961, respectively, as dividends distributions.

(c) Error in treating a loan repayment by Doornbosch Brothers, Inc. in the amount of $2,000.00 during the year 1960 as the distribution of a dividend.

In docket No. 5427–63 petitioners allege that the deficiencies as determined are based upon the following errors:

(a) Error in disallowing to petitioners deductions of $232.00, $261.00 and $1,010.00, for travel expense incurred in the years 1958, 1959 and 1961, respectively.

(b) Error in treating interest in the amounts of $280.00, $280.00, $266.67 and $200.00, received during the years 1958, 1959, 1960 and 1961, respectively, as dividends distributions.

(c), Error in treating a loan repayment by Doornbosch Brothers, Inc. in the amount of $2,000 during the year 1960 as a distribution of a dividend.

Respondent confesses error as to assignment (a) in docket No. 5427–63.

In docket No. 5427–63 the respondent also increased petitioners' income for the calendar year 1961 by $2,616.20 for "dividend income." Petitioners did not assign error as to this item. Respondent, however, now concedes that $1,163.60 ($774, plus one-half of $779.20) of the $2,616.20 does not constitute dividend income and that the deficiency for 1961 should be modified accordingly.

### FINDINGS OF FACT

The stipulated facts, together with the exhibits attached thereto, are incorporated herein by this reference.

Doornbosch Bros., Inc., petitioner in docket Nos. 5414–63 and 5415–63, hereinafter sometimes referred to as the American company, is a corporation organized under the laws of the State of New Jersey. It filed Federal income tax returns for the fiscal years ended June 30, 1959, 1960, 1961, and 1962, with the district director of internal revenue, Newark, N.J. It filed no returns as withholding agent under sections 1441 and 1461 of the Internal Revenue Code of 1954.

Jan Doornbosch and Ruth Doornbosch, petitioners in docket No. 5416–63, are husband and wife, residing at 270 Prospect Avenue, Oradell, N.J. They filed joint Federal income tax returns for the calendar years 1958, 1959, 1960, and 1961 with the district director of internal revenue, Newark, N.J.

John J. Doornbosch and Vivian M. Doornbosch, petitioners in docket No. 5427–63, are husband and wife residing at 279 Wierimus Lane, Oradell, N.J. They filed joint Federal income tax returns for the calendar years 1958, 1959, 1960, and 1961 with the district director of internal revenue, Newark, N.J.

The American company was organized on February 1, 1946, and has at all times been engaged in the distribution and sale throughout the United States of flower bulbs imported from Europe, principally Holland. During the years involved herein it was and still is owned by four brothers, in the following proportions:

|  | Ownership of outstanding stock (percent) |
|---|---|
| John J. Doornbosch—citizen and resident of United States___ | 28 |
| Jan Doornbosch—citizen and resident of United States_____ | 24 |
| Johannes Doornbosch—citizen and resident of Holland_____ | 24 |
| Hendrik Doornbosch, a.k.a. Henry Doornbosch—citizen and resident of Holland_____ | 24 |

The two American brothers are its principal officers and all four of them constitute its board of directors.

Doornbosch & Co., N.V., is a corporation organized under the laws of Holland and is hereinafter sometimes referred to as the N.V. company. During the period involved herein it has been and still is engaged in the business of growing flower bulbs in Sassenheim, Holland. All of its sales in the United States were made exclusively to the American company. During said period it was and still is owned by the same four brothers, in the following proportions:

|  | Ownership of outstanding stock (percent) |
|---|---|
| Johannes Doornbosch of Holland_____ | 28 |
| Hendrik Doornbosch of Holland_____ | 24 |
| John J. Doornbosch of United States_____ | 24 |
| Jan Doornbosch of United States_____ | 24 |

The two Dutch brothers are its principal officers and all four of them constitute its board of directors.

Under the laws of Holland, the export of flower bulbs is regulated by the Commodity Board for Ornamental Plants (Produktschap voor Siergewassen), hereinafter referred to as the Commodity Board. In the exercise of its regulatory powers the said Commodity Board, among other things, establishes annual minimum export prices for said bulbs and maximum discounts thereon according to the classification of the foreign country purchasers. The classification of these purchasers is made by the Industrial Board for Trade in Flower Bulbs (Bedrijfschap voor de Bloembollenhandel) subject to the approval of the Commodity Board.

The American company (Doornbosch Bros., Inc.) made purchases of merchandise during the taxable years here involved, as follows:

*FYE June 30—*

| | |
|---|---|
| 1959_____ | $354, 833. 20 |
| 1960_____ | 374, 892. 51 |
| 1961_____ | 359, 650. 66 |
| 1962_____ | 320, 527. 26 |

Seventy-five to 80 percent of the above purchases were from the N.V. company (Doornbosch & Co., N.V. of Holland).

The above purchases from the N.V. company were billed by N.V. at minimum export prices, less a discount of 15 percent. N.V. also paid loading charges, freight charges from the warehouse in Sassenheim to Rotterdam, United States and Holland plant protection and inspection charges, bills of lading, consular invoices, and insurance to ultimate destination, all of which amounted to approximately 5 percent of the minimum export prices. Under Holland law, these expense items could not be borne by the seller if the sale was at the minimum export price, less maximum allowable discount, which, for recognized jobbers such as the American company, under Holland law was 20 percent. Not included in the above 5-percent charges were charges for packing and crating, which alone amounted to approximately 4 percent of the minimum export prices, and under Holland law had to be paid by the purchaser.

The export regulations promulgated by the Commodity Board, governing the 1958 crop of bulbs, and applicable to shipments received by the American company during its fiscal year ending June 30, 1959, provided in part, as follows:

*Article 3*

1. In reduction of the prices referred to in Article 1, and subject to compliance with the relevant regulations of the Commodity Board for Ornamental Plants, a wholesaler-retailer discount may be granted which shall not be in excess of:

a. 20 percent, in the case of export to wholesaler-retailers in the United States of America and Canada, who are certified by the Flower Bulb Trade Association with the approval of the Commodity Board for Ornamental Plants; and,

b. 10 percent of the invoice value of the exported flowering-plant bulbs and/or tubers, in the case of delivery to seed dealers, department stores, and mail order houses in the United States of America and Canada, certified by the Flower Bulb Trade Association with the approval of the Commodity Board for Ornamental Plants, which buy at least $10,000.00 worth of flowering-plant bulbs and/or tubers in the 1957/1958 export season.

2. The discounts referred to in paragraph 1 may be granted only provided the flowering-plant bulbs and/or tubers are actually exported to the United States of America and/or Canada.

3. No discounts other than those expressly specified by the Flower Bulb Trade Association may be granted to buyers in countries other than those mentioned in paragraph 1, in reduction of the prices referred to in Article 1.

The regulations covering the 1959, 1960, and 1961 crops are substantially identical with those governing the 1958 crop. During the taxable years here involved, the American company was placed in the 20-percent discount category. The 20 percent was made up of the above-mentioned discount of 15 percent, plus the above-mentioned charges that were paid by N.V., which approximated 5 percent.

Although a maximum discount of 20 percent was permitted by Holland law, this discount was not mandatory. Thus, if a specie

were in short supply, a lesser discount or none at all might be given. During the period from 1958 to 1962 the market in Holland relative to prices of bulbs was a rising market continuously. To a large extent, market prices were in excess of controlled minimum prices.

Paragraph 1 of article 2 of the above-mentioned export regulations governing the 1958 crop provided:

> 1. The prices referred to in the preceding Article are reckoned "ex barn" [beyond the barn, which is beyond the warehouse] exclusive of additional charges, such as packing, freight, insurance, etc.

The regulations covering the 1959, 1960, and 1961 crops are substantially identical.

The cost of the charges for packing and crating was billed by the N.V. company to the American company and amounted to $10,275 in fiscal 1959, $10,405 in fiscal 1960, $12,956 in fiscal 1961, and $13,328 in fiscal 1962. The American company claimed these amounts as a part of its purchases. The respondent disallowed the claim and, in a statement attached to the deficiency notice, gave as his explanation for fiscal 1959 the following:

(a)  Purchases_____ $10, 275. 00

Packing and crating_____ $10, 275. 00

Purchases are disallowed in the above amount for packing and crating which have been included in the cost of bulbs purchased from taxpayer's related foreign corporation—Gebr. Doornbosch, N.V. in Holland. The above-stated costs are disallowed as representing excessive or unreasonable charges and other than ordinary and necessary business expenses.

Similar explanations were given for fiscal 1960, 1961, and 1962.

Approximately 80 percent of the bulbs purchased from the N.V. company are shipped directly to the American company's customers. The remaining 20 percent is shipped to the American company's warehouse. On the 80 percent that the N.V. shipped directly to the American company's customers, invoices were made out and mailed by the N.V. There are between 500 and 600 customers each year. All the American company did was to book the order and collect the money. Johannes and Hendrik Doornbosch, who are in Holland, spent most of their time on the above work. They provided more refined grading beyond what is normally required. In addition, there was the packing and shipping to individual customers, tagging of cases, and individual invoicing. Also, they inspected bulbs purchased by the American company from other bulb growers in Belgium, France, and Italy as to size and quality and made sure the American company got full and proper delivery. They also entertained important customers of

the American company who were traveling in Europe. The minimum export price would not include any of these additional services. Neither were these additional services included in the previously mentioned "5 percent charges." It was for these services and expenses in connection therewith, as well as for purchases they made for the American company (from other suppliers in different countries), that they were paid. During the fiscal year 1959 Johannes received $10,500 and Hendrik $9,200.

In the later years, instead of direct payments to Johannes and Hendrik, the N.V. company made a 6-percent charge for similar services and expenses in behalf of the American company. The payments were reasonable in amount. The amount paid had nothing to do with the stock ownership of the several brothers and bore no relation to it. Both Johannes and Hendrik have been in the bulb business for over 30 years. They are thoroughly familiar with every phase of the bulb business, have a good reputation in the industry, and are eminently qualified to render the type of service which was performed for the American company all these years. Both Johannes and Hendrik, as officers of the N.V. company, devoted most of their time to the business of the American company. The American company could not possibly obtain all of these services any other way unless it were prepared to pay a lot more for them.

The American company deducted the $19,700 on its fiscal year 1959 return under the heading, "Other Deductions" as representing fees and commissions. The respondent disallowed the claimed deduction and, in a statement attached to the deficiency notice, gave as his explanation therefor the following:

(b) Commissions and fees_____ $19, 700. 00

It has been determined that the amount of $19,700.00 claimed as a deduction for commissions and fees and representing payments made to Hendrik Doornbosch of $9,200.00, and to Johannes Doornbosch of $10,500.00, are disallowed because such payments are held to constitute dividend distributions to the recipients, both nonresident alien individuals, and not ordinary and necessary business expenses.

The 6-percent special handling charge made in the later years amounted to $19,914.25 in fiscal 1960, $18,516.70 in fiscal 1961, and $16,124.70 in fiscal 1962. Such charges were reasonable charges for the services that were rendered to the American company. The minimum export price did not include any such charges and neither were they included in the previously mentioned "5 percent charges." The American company claimed these amounts as a part of its purchases. The respondent disallowed the claim and, in a statement attached

to the deficiency notice, gave as his explanation for fiscal 1960 the following:

(a) Purchases_____ $30,319.25

| | |
|---|---|
| Packing and crating_____ | $10,405.00 |
| 6-percent handling charges_____ | 19,914.25 |
| | 30,319.25 |

Purchases are disallowed in the above amount for packing, crating, and 6-percent handling charges which have been included in the cost of bulbs purchased from taxpayer's related foreign corporation, Gebr. Doornbosch, N.V., in Holland. The above-stated costs are disallowed as representing excessive or unreasonable charges and other than ordinary and necessary business expenses.

Similar explanations were given for fiscal 1961 and 1962.

The American company was organized on February 1, 1946, by three of the four Doornbosch brothers, Johannes and Henry of Holland, and John of the United States. Jan at that time was in the armed services. The three brothers paid in $50,000 and in exchange therefor received $25,000 in capital stock of the corporation and, in the same proportions, $25,000 in notes of the corporation. The notes of the corporation were dated February 19, 1946, were payable 10 years after date, bore interest at 4 percent per annum, and were issued to the three brothers as payees, as follows: John J. Doornbosch—two notes of $7,000 and $2,000; Johannes Doornbosch—two notes of $6,000 and $2,000; Henry Doornbosch—two notes of $6,000 and $2,000. Each of said notes bore the following endorsement thereon:

This note is transferable only upon compliance with the conditions of a certain agreement dated the 19th day of February, 1946 between John J. Doornbosch, Johannes Doornbosch, Henry Doornbosch and Jan Doornbosch, a copy of which is on file in the office of the corporation.

The agreement referred to in the above-quoted endorsement on the notes was between the three Doornbosch brothers as "contracting stockholders" and Jan Doornbosch. The agreement recited the purpose thereof to be the retention of control of the American company by the contracting stockholders, the provision for transfer and sale of the stock of a deceased stockholder, and the prevention of the transfer or sale of the stock to other persons except as provided in the agreement, and then provided as follows:

1. No contracting stockholder shall sell, pledge, transfer or assign any of the stock of the corporation, nor transfer, negotiate or discount any promissory note of the corporation without the consent of the other Contracting Stockholders. * * *

The remainder of this first paragraph required a stockholder desiring to sell his stock first to offer it to the remaining stockholders at a price and upon terms specifically provided for in the agreement.

Paragraphs 2, 3, and 4 contained provisions for the remaining stockholders to purchase the shares of a deceased stockholder, the price at which the stock was to be sold to the remaining stockholders, and the terms upon which the sale was to be made.

Paragraph 5 provided for the endorsement of the stock with a legend similar to the endorsement on the notes as above set forth, and the remainder of the body of the agreement was as follows:

6. The promissory notes totaling $25,000 issued by the corporation to the stockholders and dated February 19th, 1946 are also made subject to the terms of this agreement and shall have stamped or endorsed thereon a legend similar to the legend on the stock certificates. In the event of any sale of stock of the corporation any promissory note or notes of the corporation shall be transferred to the purchasing stockholders for the amount due thereon.

7. The Contracting Stockholders further agree that the only exception to this agreement shall be that they may at any time within two years from the date hereof, each sell and transfer to Jan Doornbosch two shares of the capital stock of the corporation and each assign to him a promissory note of the corporation in the amount of $2,000 for the total sum of $4,000 to each, and a total sum to all of $12,000. The said Jan Doornbosch undertakes and agrees to pay the said consideration to the said Contracting Stockholders in the event that the six shares of capital stock of the corporation and promissory notes of the corporation totaling $6,000 are offered to him.

8. This agreement may be revoked or amended only by the unanimous consent of all of the surviving Contracting Stockholders.

By agreement dated February 19, 1948, the four Doornbosch brothers modified the agreement of February 19, 1946, in the following respects:

After referring to the agreement of February 19, 1946, and its provisions "concerning the ownership of the capital stock" of the American company "and the holding and payment of certain notes of said corporation," the price for the stock of a deceased or selling stockholder to the remaining stockholders was changed to "book value" as of the end of the fiscal year preceding the sale, and the rest of the agreement provided as follows:

2. The parties have, in accordance with the provisions of paragraph 7 of said original agreement, transferred and sold to Jan Doornbosch each two shares of the capital stock of the corporation and assigned to him promissory notes of the corporation so that Jan Doornbosch is now the owner and holder of six shares of capital stock of said corporation and promissory notes of the corporation in the amount of $6,000.00 and the parties all agree that paragraph 7 of the original agreement has been complied with.

\*  \*  \*  \*  \*  \*  \*

5. Paragraphs 5 and 6 of the original agreement are modified to the extent that the endorsement to be made upon the stock certificates and the promissory notes shall contain the additional words "and in compliance with the modification agreement dated the 19th day of February, 1948."

In February 1953 the American company was recapitalized by the issuance of two classes of stock, class A and class B, and the four Doornbosch brothers continued to hold their respective interests in the company, as recapitalized. In connection therewith the aforementioned stockholder agreements of February 19, 1946, and February 19, 1948, were canceled and revoked; a new stockholders' agreement was executed providing for the sale of the stock of a withdrawing or deceased stockholder and the deposit of the stock, for that purpose, with designated trustees, and the aforementioned notes of the American company were replaced by new notes dated February 19, 1953, payable on demand and bearing interest at 4 percent per annum. The payees of said notes were the same as the holders of the previous notes, namely, John $7,000, Jan $6,000, Johannes $6,000, and Hendrik $6,000. The demand notes carried no endorsement as did the earlier notes.

On or about February 19, 1960, the American company paid to each of the payees of said notes $2,000 on account of the principal thereof and replaced said notes with new notes in the reduced amounts, dated February 19, 1960, payable on demand and bearing interest at 4 percent per annum. Neither did these new demand notes carry any endorsement as did the earlier notes.

The above payment of $8,000 on account of the principal of the notes was made pursuant to a resolution at a special meeting of the board of directors of the American company on December 14, 1959. At this meeting it was also unanimously—

RESOLVED FURTHER: That there be declared and paid a dividend of $24 per share upon the outstanding capital stock of the Corporation, payable forthwith to stockholders of record this day.

During the years involved herein, the American company paid to the four Doornbosch brothers, as interest on those of the aforementioned notes which were outstanding during said years, the following total amounts:

| FYE June 30— | Total | Nonresident aliens | | U.S. citizens | |
|---|---|---|---|---|---|
| | | Johannes | Hendrik | Jan | John |
| 1959 | $1,000.00 | $240.00 | $240.00 | $240.00 | $280.00 |
| 1960 | 946.68 | 226.67 | 226.67 | 226.67 | 266.67 |
| 1961 | 680.00 | 160.00 | 160.00 | 160.00 | 200.00 |
| 1962 | 680.00 | 160.00 | 160.00 | 160.00 | 200.00 |

During the taxable years in question, the demand notes were at all times reflected as indebtedness on the books of the American company. They were shown as indebtedness on the balance sheets issued by the American company for any and all purposes and were never subordi-

nated.  The notes represented a true indebtedness of the American company and not equity capital as determined by the respondent.

In connection with the work of the American company, it was necessary for trips to be made to Holland and elsewhere.  Sometimes Jan Doornbosch went to Holland, sometimes John Doornbosch went, and sometimes they both went.  These trips were made every year since the inception of the business and without them the business could not be properly carried on.  The American company paid for these necessary trips during the taxable years here involved the following amounts:

> During fiscal year ended 6/30/59—$840.00 for trip by John.
> During fiscal year ended 6/30/60—$973.00 for trip by Jan.
> During fiscal year ended 6/30/61—$1,063.00 for trip by John.
> During fiscal year ended 6/30/62—$779.20 for trip by Jan and John.
> During fiscal year ended 6/30/62—$774.00 for trip by John.

The American company deducted in the respective taxable years the above amounts (the total for fiscal 1962 was $1,553.20) as ordinary and necessary business expenses.  The amounts were disallowed by the respondent and, in a statement attached to the deficiency notice, the respondent gave as a typical explanation the following:

(d) Travel Expenses_____ $840. 00

Cost of trip to Holland by United States stockholder-officer in current year has been disallowed because it was not established that such trip was undertaken primarily for conducting the business of the taxpayer corporation.

In the case of the individual taxpayers, the respondent included in their respective income the above amounts disallowed as deductions to the corporation as representing "a dividend distribution of the corporation's earnings and profits and, therefore, includable on your return as dividend income."  (Quotation from statement attached to deficiency notice in docket No. 5416–63.)  The amounts [3] so included were as follows:

| Taxable year | Docket No. | Amount |
|---|---|---|
| 1959 | 5427–63 | $840. 00 |
| 1960 | 5416–63 | 973. 00 |
| 1961 | 5427–63 | 1, 063. 00 |
| 1961 | 5427–63 | 779. 20 |
| 1961 | 5427–63 | 774. 00 |

[3] Only petitioners in docket No. 5416–63 (Jan Doornbosch, *et ux.*) assigned error as to these amounts, namely, the $973 for calendar 1960. As to docket No. 5427–63 (John J. Doornbosch, *et ux.*) see our notation in our opening statement, *supra,* regarding respondent's voluntary concession of $1,163.60 of the $2,616.20 [$1,063+$1,553.20 ($779.20+$774).] increase in petitioners' calendar 1961 income. The deficiency notice in docket No. 5427–63 also increased petitioners' calendar 1959 income by the $840 claimed by the corporation for fiscal 1959. But petitioners in docket No. 5427–63 assigned no errors as to such increases.

The questions to be resolved are primarily questions of fact and, in effect, have already been answered in our findings of fact. The principal question concerns assignments of error (a) and (b) in docket No. 5415–63, namely, whether the respondent erred in disallowing certain amounts claimed by the American company as a part of its cost of "purchases" of bulbs for all 4 taxable years and a claimed deduction in fiscal 1959 of compensation paid the two Dutch brothers for services actually rendered the American company during that year. The specific amounts involved are as follows:

| Item | Fiscal year | | | |
|---|---|---|---|---|
| | 1959 | 1960 | 1961 | 1962 |
| Purchases: | | | | |
| Packing and crating | $10,275 | $10,405.00 | $12,956.00 | $13,328.00 |
| 6-percent handling charge | | 19,914.25 | 18,516.70 | 16,124.70 |
| Compensation | 19,700 | | | |
| Totals | 29,975 | 30,319.25 | 31,472.70 | 29,452.70 |

The American company sold bulbs to approximately 500 to 600 customers in the United States. It purchased the greater part of those bulbs from the N.V. company of Holland. The American company was a New Jersey corporation and the N.V. company was a Holland corporation. Both corporations were owned by four brothers. Two of the brothers (Jan and John) were citizens of the United States and were the officers of the American company. The other two brothers (Johannes and Hendrik) were citizens of Holland and were the officers of the N.V. company. All four brothers were directors in both corporations.

The purchase price of bulbs was regulated by the laws of Holland. Under the laws of Holland, bulbs could not be exported except at "minimum export prices" less "maximum discounts." The export prices could be more than the minimum and the discounts could be less than the maximum provided by law. Holland law provided for two categories of discounts, a 20-percent discount and a 10-percent discount. During the taxable years here involved, the American company was in the 20-percent category.

Any charge such as "packing, freight, insurance, etc." in addition to the minimum export price less the maximum discount had to be borne by the purchaser. Under Holland law, no charge or expense could be borne by the seller if the sale was at the minimum export price less the maximum discount.

In the instant case the purchases made by the American company were billed by the N.V. company at minimum export prices, less a

discount of 15 percent. Therefore, the N.V. company could pay for certain charges provided they did not exceed 5 percent. In fact, the N.V. company did pay the loading charges, freight charges from the warehouse in Sassenheim to Rotterdam, United States and Holland plant protection and inspection charges, bills of lading, consular invoices, and insurance to ultimate destination, all of which amounted to approximately 5 percent of the minimum export price. Such charges making up the 5 percent did not include charges for packing and crating which alone amounted to approximately 4 percent of the minimum export price. The costs for packing and crating for the taxable years here involved had to be borne by the American company under Holland law since they were not a part of the charges making up the 5 percent paid by the N.V. company. We hold that the respondent erred in disallowing these amounts as a part of the cost of purchases of the American company.

The $19,700 deducted by the American company in fiscal 1959 and the 6-percent handling charges for the remaining 3 taxable years are in the same category as the packing and crating charges. In our findings we have itemized these charges at some length. They definitely were not a part of the charges making up the above-mentioned 5 percent which were borne by the N.V. company. Therefore, they, too, had to be borne by the purchaser under Holland law. Neither can such handling charges be said to be unreasonable. In this connection we have the testimony of Cornelius Westerbeek of the Netherlands who has been in the bulb business for 20 years, growing, buying, and exporting flower bulbs to the United States, Germany, and other countries, with a complete knowledge of the bulb business. He was asked this question:

Q. Based on your knowledge of the bulb industry and the conditions, customs and procedures prevailing during the period from July 1, 1958 to June 30, 1962, would 6 percent have been more than a reasonable charge for the services mentioned in the preceding question?

Westerbeek answered thus:

A. No, definitely not. I believe twice 6 percent would be closer to what I would consider the reasonable charge for such extensive additional services as mentioned in the preceding question.

As to assignments of error (a) and (b) in docket No. 5415-63, we hold for petitioner.

As to assignment of error (c) in docket No. 5415-63, the respondent, in his brief, correctly poses the question there involved, as follows:

The question whether stockholder payments into a family corporation represents an investment in capital or in an indebtedness of the corporation is not new; and the cases thereon are legion. It is primarily a factual question, the determination of which varies from case to case depending upon the variations of the facts.

In the instant case we think the evidence clearly shows that the demand notes which were in existence during the taxable years represented pure indebtedness of the corporation and not equity capital. Interest was always paid at the rate provided. The notes were always reflected on the books and records of the corporation as indebtedness. The notes were never subordinated to the rights of other creditors. Substantial payments of the principal of the notes were made in 1960. Dividends were paid on the corporation's outstanding stock. The ratio of debt to capital stock was never out-of-line. Originally this ratio was 1:1. The four brothers invested $50,000 in the business, $25,000 of which was represented by capital stock and $25,000 by notes. Originally the notes that were issued were tied in with the capital stock but long before the taxable years here involved, namely, in 1953, there no longer remained any restriction on the disposal of the notes by the noteholders. We think the great preponderance of the evidence indicates that the notes in the instant case were what they purported to be and not capital stock. We hold for petitioner on this issue. Our holding on this issue likewise resolves assignments of error (b) and (c) in docket Nos. 5416-63 and 5427-63 in favor of the individual petitioners in those docket numbers.

As to assignment of error (d) in docket No. 5415-63, the evidence is clear that the trips to Holland and elsewhere made by the two American stockholders, Jan and John, of the American company were ordinary and necessary in the business of that company. The trips were undertaken for the company's business. The amounts paid by the company for such trips are deductible as ordinary and necessary business expenses. Sec. 162(a), I.R.C. 1954. We hold for petitioner on this issue.

As to assignment of error (a) in docket No. 5416-63, we hold that the respondent erred in determining that the $973 which the American company paid in 1960 for Jan's round trip to Europe represented a dividend distribution to Jan. The trip was purely a business trip. We held, under error (d) in docket No. 5415-63, that the cost of the trip was deductible by the corporation. It was not income to Jan.

In 1961 respondent increased petitioners' income in docket No. 5416-63 by $535 and, in a statement attached to the deficiency notice, gave as an explanation therefor the following:

(a) Your claimed deduction from gross income in the amount of $535.00 for travel expenses, representing the costs of a trip to Holland, has been disallowed because it was not established that this amount was expended for an ordinary and necessary business expense or for the production of income.

Petitioners, while they assigned this as error, did not offer any evidence in regard thereto. Accordingly, we hold for the respondent as to the $535.

The deficiencies in withholding tax in docket No. 5414–63 for the calendar years 1959 through 1962 were made "In accordance with the provisions of Sections 1441 and 1461 of the Internal Revenue Code of 1954 * * *." (Quoted matter taken from deficiency notice.) The material provisions of these sections are in the margin.[4]

As stated in our opening statement, *supra*, the respondent determined that certain alleged "commissions paid" of $19,700, "interest paid," and "loans repaid" by the American company to its nonresident alien stockholders represented "dividend distributions." In a statement attached to the deficiency notice the respondent explained his determination thus:

The above amounts have been determined to represent dividends distributions paid by Doornbosch Brothers, Inc., to their non-resident alien stockholders. The amounts so paid are subject to withholding taxes at the rate of 15 percent as determined by Tax Treaty with the country of Netherlands, relative to dividend payments.

The withholding tax on *dividends* was limited by tax treaty with the Netherlands to 15 percent. See sec. 7.857 of T.D. 5778, 1950–1 C.B. 92, 106.

Petitioner contends that the above-mentioned determinations were *not dividends* and, therefore, no withholding was required.

The respondent in his brief says that the determination of this issue follows "As A Matter Of Course" upon the determination of the issues considered by us in docket No. 5415–63, and that:

(a) If the respondent's position is sustained with respect to the "Fees and Commissions" paid to the Holland brothers, then the payments made to the Holland brothers would be distributions of dividends to nonresident aliens; and the American Company would be liable for the withholding taxes thereon under sections 1441 and 1461 of the Internal Revenue Code.

If the respondent's position that the corporate notes represented capital investment is sustained, then the $2,000.00 payments to the Holland brothers on account of the notes, and the payments to them of the interest on said notes, would similarly be distributions of dividends to nonresident aliens and the American company would be liable for the withholding taxes thereon. The company filed no withholding tax returns.

---

[4] SEC. 1441. WITHHOLDING OF TAX ON NONRESIDENT ALIENS.

(a) GENERAL RULE.—Except as otherwise provided in subsection (c), all persons, in whatever capacity acting * * * having the control, receipt, custody, disposal, or payment of any of the items of income specified in subsection (b) (to the extent that any of such items constitutes gross income from sources within the United States), of any nonresident alien individual, * * * shall * * * deduct and withhold from such items a tax equal to 30 percent thereof

(b) INCOME ITEMS.—The items of income referred to in subsection (a) are interest * * *, dividends, rent, salaries, wages, premiums, annuities, compensations, remunerations, emoluments, or other fixed or determinable annual or periodical gains, profits, and income * * *

SEC. 1461. RETURN AND PAYMENT OF WITHHELD TAX.

Every person required to deduct and withhold any tax under this chapter shall, on or before March 15 of each year, make return thereof and pay the tax to the officer designated in section 6151. * * *

The respondent has not suggested or offered any alternative in case his position taken in the deficiency notice is not sustained.[5]

In docket No. 5415–63, we have held that the items which the respondent determined to be dividends in docket No. 5414–63 were *not dividends*. Therefore, the basis for the respondent's determination that the American company was liable for a withholding tax on these items disappears. We hold for the petitioner in docket No. 5414–63.

*Decisions will be entered under Rule 50.*

[5] Apparently the respondent is satisfied thus to posture his position in the light of the tax treaty between the United States and the Kingdom of the Netherlands, signed Apr. 29, 1948, and effective Jan. 1, 1947, which, in article VIII, provides that such interest shall be exempt from U.S. tax.