ROBERT LiBUTTI a/k/a ROBERT PRESTI AND JOAN LiBUTTI a/k/a JOAN PRESTI, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Libutti v. Comm'r
Docket Nos. 5977-75, 6289-77, 547-79.
United States Tax Court
T.C. Memo 1985-314; 1985 Tax Ct. Memo LEXIS 318; 50 T.C.M. (CCH) 241; June 26, 1985. *318 Held, Ps failed to report all of their income from recing activities and sale of thoroughbred horses; Held further, Ps business expenses determined with respect to the taxable years 1969 through 1971; Held further, Ps are not entitled to a claimed bad debt loss and theft loss in 1971; Held further, fraud not proven with respect to Petitioner Robert LiButti for taxable years 1968 and 1969; Held further, fraud proven with respect to Petitioner Robert LiButti for the taxable years 1970 and 1971; Held further fraud not proven with respect to Petitioner Joan LiButti for the taxable years 1968 through 1971; Held further, petitioner Joan LiButti failed to establish that she qualified as an innocent spouse with respect to the deficiency for the year 1971; Held further, the statute of limitations has expired and thus the assessments are barred for the taxable years 1968 and 1969; Held further, the deficiency for the taxable year 1970 is not barred based on the finding that a part of the underpayment was due to the fraud of petitioner Robert LiButti under section 6653(b) and section 6501(c)(1). Steven P. Marshall and Jack Arsenault, for the petitioners. Daniel O'Brien and Matthew Magnone and *319 William Garofalo, for the respondent. FEATHERSTON
MEMORANDUM FINDINGS OF FACT AND OPINION FEATHERSTON, Judge: This case was assigned to and heard by Special Trial Judge Peter J. Panuthos pursuant to the provisions of section 7456(c) [1], and General Order No. 8 of this Court, 81 T.C. XXIII (1983). After review of the record, we agree with and adopt his opinion which is set forth below. OPINION OF THE SPECIAL TRIAL JUDGE PANUTHOS, Special Trial Judge: Respondent determined deficiencies in petitioners' Federal income tax and additions to tax for the taxable years 1968 through 1971 as follows: Additions to Tax
Year
Deficiency
Sec.6653(b)
1968
$4,053.81
$2,026.91
1969
1,637.85
818.93
1970
201,120.18
100,360.09
1971 [2] *320 459,893.01
229,946.51
The issues remaining for decision are as follows: (1) Whether petitioners failed to report income earned from the sale of, and activities involving racing of, thoroughbred horses during the years 1968 and 1971; (2) whether petitioners are entitled to claimed business expenses deductions in excess of those allowed by respondent; (3) whether petitioners are entitled to a claimed theft and bad debt loss in 1971; (4) whether each of the petitioners is liable for the additions to tax for fraud under section 6653(b); (5) whether the statute of limitations has expired with respect to the taxable years 1968, 1969 and 1970; (6) whether petitioner Joan LiButti was an innocent spouse within the meaning of section 6013(e) with respect to the taxable year 1971; and (7) whether the statute of limitations has expired for the taxable years 1968, 1969 or 1970. General Factual Background
Some of the facts have been stipulated and are incorporated herein by this reference. Petitioners, Robert and Joan LiButti, are husband and wife (hereinafter Robert LiButti will be referred to as petitioner). Petitioner was born Rafaele Robert LiButti. His formal education terminated in *321 the ninth grade. Petitioner worked as a truck driver during 1968 and was employed by Buckeye Leasing, a division of Bethlehem Steel. In addition to his job as a truck driver, petitioner also worked for his uncle, Nicholas Spadea (hereinafter Spadea). Spadea had been involved in various aspects of the horse business since the end of World War II. Spadea had a racing license in New York State where he raced under the name of Goldtree Stables. During 1968 Spadea was in declining health and petitioner increasingly managed the affairs of Spadea's business. Petitioner, having had Spadea's power of attorney since 1957, signed Spadea's name as agent of his uncle. In 1968 and 1969 petitioner began getting involved in the hourse business for his own benefit. He bought and sold horses for himself using either the name Spadea or Presti. In 1969 petitioner began using the name Presti for business. Petitioner adopted the name because, in his opinion, it sounded less Italian and projected the kind of image he was seeking, and because he had an outstanding judgment against him which he did not wish to be discovered by his prospective landlord during a credit check. Petitioner continued to *322 do business under the name Presti in 1970 and 1971. In 1970 petitioner became fully involved in the thoroughbred horse business. His business involved buying and selling horses, as well as acting as an agent or broker for others who wished to buy or sell horses. The parties agree that petitioners were accrual basis taxpayers with respect to the activities related to the hourse business for all the years in issue. In 1970 and 1971 petitioner enjoyed an improved standard of living. He moved from New Jersey and lived in various homes on Long Island. Petitioner entertained lavishly; he frequently held parties at the Villa Pierre restaurant to which he invited people for whom he hoped to act as an agent. The people whom petitioner entertained at parties were interested in buying or selling horses. In 1970 petitioner bought his most successful horse, Jim French. Over the course of 1970 and 1971, petitioner sold various interests in Jim French, and he later purchased those interests back. Finally in 1971 petitioner again owned the majority interest in the horse. Petitioner sold Jim French in the fall. In October and November of 1971 various articles appeared in newspapers and sports *323 magazines containing negative publicity about the sale and petitioner's involvement in it. Recordkeeping and Return preparation.
Petitioner's income tax returns for the years 1968 through 1971 were prepared by his cousin John Manzi (hereinafter Manzi), a licensed public accountant in New Jersey. As a basis for preparing the returns from 1968 to 1971 Manzi used petitioner's W-2 forms which were given to him by petitioner's mother. Manzi did not discuss the return preparation with petitioner nor did he sign the forms as preparer. For the years 1968, 1969, and 1970 the returns indicated petitioner's address as 687 Third Street, Seacaucus, New Jersey, which was the home of petitioner's parents. Manzi also prepared petitioner's 1971 return but petitioner participated more actively in the preparation of this return. Petitioner and Manzi met between fifteen and twenty times (at petitioner's home at 1 Ripley Lane, Muttontown, New York) during 1971 and 1972 to work on the return. On the return, however, petitioner's address was listed as 271 Elsmere Place, Fort Lee, New Jersey; the home of petitioner's aunt and uncle. To prepare the 1971 return Manzi used papers supplied by petitioner *324 and a business associate's accountant, including sales tax receipts, bills, checks, contracts, and work papers. If Manzi did not have any documentation of cash purchases or disbursements he did not include them on the return. In September of 1971 petitioner made an estimated tax payment for 1971 in the amount of $50,000. In 1972 Manzi prepared an amended return for 1971 for petitioner. Manzi prepared this return as a result of notification by the Internal Revenue Service that petitioner was undr investigation. Since this is primarily a factual case which requires lengthy analyses of various transactions, we will incorporate our findings of fact and opinion separately for each of the years involved. [3]
Taxable Year 1968
Income:Factual Background
During the year petitioner and his family lived at 689 Dorchester Lane, New Milford, New Jersey. Petitioner adopted the name Nicholas Spadea to transact certain purchases and sales of horses. Using the name Spadea, petitioner purchased Sweet Music from Fasig-Tipton Company in February of 1968 for $4,000 and sold it through the *325 same company in May of 1968 for $5,500. In addition, using the name Spadea petitioner also purchased three other horses from Fasig-Tipton Company in 1968. Those horses were Round Table Pet, Taste of It, and Stake Queen. The Fasig-Tipton Company ultimately received promissory notes in an aggregate amount of $14,017.50 from petitioner who used the name Nick Spadea. In addition petitioner used the name Spadea to purchase jewelry at a jewelry store owned in part by Jerry Marsh (hereinafter Marsh). Petitioner purchased the jewelry with checks drawn on the account of Nicholas and Joanne Spadea, Dorchester Lane, New Milford, New Jersey. The total of the checks was $6,800. Petitioner asked Marsh to hold the checks for three weeks until petitioner could redeem them for cash. After the three week period passed, Marsh deposited the checks and they eventually were returned unpaid.Petitioner ultimately made restitution to Marsh in 1971 in the amount of $5,200. Petitioner in 1968 also used the name Nicholas Spadea to purchase two horses from Lillian Morrissey (hereinafter Morrissey). The two horses, Purple Velvet and Anchored, cost $12,000 each and were paid for with 24 postdated $1,000 *326 checks. As the first six checks became due, a woman purporting to be Mrs. Spadea came to Morrissey's house and gave her $1,000 in cash. Morrissey received $6,000 in this fashion. Thereafter Morrissey deposited into her bank account the checks she had in her possession. The checks were returned with "account closed" stamped on them. Morrissey's attorney then filed an action to collect the balance due Morrissey on the sale of the two horses. She was awarded a judgment. Nevertheless, she never collected on the judgment. At trial Morrissey identified petitioner as Nicholas Spadea. Subsequently, in 1971, Morrissey again sued petitioner on the unpaid checks. This suit was settled by payment of $2,250 from petitioner to Morrissey. In mid-August of 1968 petitioner, again using the name Spadea, encouraged Edward Draves (hereinafter Draves), a tavern owner, to hand over to petitioner two personal checks in the respective amounts of $10,000 and $13,000. The checks were payable to Nicholas Spadea. Petitioner promised that the checks would be used to help buy horses for him and Draves. He also promised that the checks would not be cashed but used merely to inspire, confidence in potential *327 horse sellers that the two men could afford to purchase horses. At the time Draves gave petitioner the checks there were insufficient funds in Draves' checking account to cover the checks. Eventually these checks were cashed. Draves reached a settlement with the bank on which the checks were drawn; he agreed to pay $8,000 to the bank. Draves never received any reimbursement from petitioner or any interest in any horses. Analysis
Respondent asserts that for the year 1968 petitioner sold the following horses and failed to report on his income tax return the gain on the sales: Purchase
Total Sales
Horse
Price
Price
Gain
Double Boiler
$14,500.00
$24,250.00
$9,750.00
Sweet Music
4,000.00
5,025.00
1,025.00
Native Sidecar
7,500.00
15,750.00
8,250.00
Total Gain
$19,025.00
Petitioner generally contends that respondent's determination that petitioner failed to report income is erroneous, and that the income earned from sales of these horses, if any, is not attributable to him but his uncle. It is axiomatic that the respondent's deficiency determination is presumed to be correct. Welch v. Helvering,290 U.S. 111 (1933). Generally, petitioner bears the burden of proving that respondent's deficiency determination *328 is incorrect. Helvering v. Taylor,293 U.S. 507 (1935); Rule 142(a).[4]
After a careful study of the record made, we have concluded that, as regards the horse Sweet Music, petitioner has not successfully carried his burden of proof. Petitioner did produce a power of attorney given by Spadea to petitioner but the power of attorney dates from 1957. Petitioner's brother-in-law and aunt offered testimony that Nicholas Spadea was illiterate and in failing health during the year; however, petitioner's witnesses are members of his close knit family and add little weight to his story. The evidence introduced by respondent on the horse Sweet Music, including testimony and invoices, establishes petitioner's involvement with the sale of this horse.Since petitioner has failed to demonstrate, by at least a preponderance of the evidence, that respondent's determination is incorrect, the determination with regard to Sweet Music is upheld. American Pipe and Steel Corp. v. Commissioner,243 F.2d 125 (9th Cir. 1957), cert. denied 355 U.S. 906 (1957). With regard to the sale of Double Boiler and Native Sidecar, petitioner denied *329 owning these horses or receiving any money from their sale. Although petitioner admits that he was involved with these horses during the year, albeit as an agent for his uncle, there is nothing in the record to link petitioner to any income generated by these horses. Petitioner has carried his burden of proof; respondent offered no evidence to refute petitioner's testimony. We find that petitioner received no income from the sale of these two horses. Taxable Year 1969
Income:Factual Background
Petitioner described his financial condition during the year as "broke". Yet petitioner began using the name Robert Presti and was engaged in the thoroughbred horse business. As part of his plan to present himself as wealthy, and in order to attract clients for his business, petitioner and his wife, in December of 1967, entered into a lease for the rental of 12 Talltree Court, Huntington, New York for $650 per month. Petitioner bought and sold three horses: Horses
Invoice Price
Date of Sale
Sales Price
Bon Tuyan
$4,000.00
11/02/69
$6,000.00
Kreils Chief
2,500.00
11/07/69
6,000.00
Mantelletto
2,625.00
11/17/69
7,000.00 The first two horses listed were purchased from the FloridaBreeder's Sales Company; *330 the third horse listed was purchased from Fasing-Tipton Company. Petitioner did not report these transactions nor any gains or losses suffered thereon on his 1969 return because of advice from his accountant. Petitioner's accountant told him that the alleged losses, which petitioner claimed, were hobby losses, therefore he could not deduct them against his other income. Analysis
The only issue facing the Court for this year is whether petitioner may add to the cost of Bon Tuyan and Kreils Chief a $10,000 commission he allegedly paid to purchase them. Petitioner argues that the commission, which he claims he paid to one Tom O'Farrell, is part of the cost of the horses. Respondent, on the other hand, argues that petitioner has not proven that any commission was ever paid. Respondent has proven that petitioner received more income in this year than petitioners reported on their 1969 income tax return. Indeed petitioner admits that he owned these horses and sold them during the year. Since petitioner now claims he sold the horses at a loss, he must demonstrate that loss to the Court. Welch v. Helvering,supra.Information which may tend to reduce petitioner's tax liability, proof *331 that he sold the horses at a loss, is within petitioner's control; therefore to sustain his position, petitioner must produce the information. Cf. United States v. Bender,218 F.2d 869, 871 (7th Cir. 1955), cert. denied 349 U.S. 920 (1955); Elwert v. United States,231 F.2d 928, 933 (9th Cir. 1956) (these cases involve criminal prosecutions for income tax evasion, yet the burden rests on the defendant to prove claimed deductions). The evidence presented by petitioner on this issue is unpersuasive and much of it strains credulity. Petitioner's brother-in-law Vincent Presti testified that petitioner received a note from Tom O'Farrell thanking petitioner for payment of the $10,000 commission on or about October 15, 1969. Presti's explanation of why he opened the note and why it was delivered to his address, rather than petitioner's is implausible. Furthermore, Presti went on to testify that he witnessed payment of the commission around Thanksgiving of 1969. No credible explanation was offered by Presti or petitioner as to why a thank you note would be sent for payment of a commission nearly one month before the commission was supposedly paid. Petitioner's testimony and evidence *332 on this issue are questionable and unreasonable. Despite the fact that respondent did not cross-examine Presti or offer any contradictory evidence, we find that petitioner has failed to meet his burden of proof on this issue. See, Demkowicz v. Commissioner,551 F.2d 929 (3d Cir. 1977); Dougherty v. Commissioner,60 T.C. 917, 932-933 (1973). [5]
Taxable Year 1970
Income:Factual Background
Horse Transactions
During this year petitioner spent substantially all of his work time in pursuit of the horse business. In the spring of 1970 petitioner bought two horses from Ralph Wilson (hereinafter Wilson). These horses were called Strider and Running Bear, and cost $30,000 and $25,000 respectively. The invoice reflecting the sale was made out to "George Poole c/o Robert Presti, Raintree Farm, 271 Elsmere Place, Fort Lee, New Jersey." George Poole (hereinafter Poole) was a thoroughbred horse trainer in 1970. Petitioner asked Wilson to write out such an invoice for tax purposes. Shortly thereafter petitioner *333 bought another horse, Change of Scenery, from Wilson for $30,000. This time the bill of sale was made out to Toni Menzella at Buck Chance Farm. Petitioner told Wilson that Toni Menzella was his niece and the reason the bill of sale should be made out to her was again for "tax purposes". With respect to the sale of Strider and Running Bear, Poole had no connection with the purchases of these horses, nor was he aware at the time of the sale that he had been identified as the purchaser. Later that year however, after these sales, Poole and petitioner developed a business relationship. Poole subsequently arranged to have his wife serve as a nominee for petitioner with respect to the ownership of some horses. As a result the horses Captain Nash, Princess Antea, and Cold Showers were placed in Mrs. Poole's name. When Poole first started training horses for petitioner Poole sent all bills to Raintree Stables. Later in the year, however, Poole sent all bills to Buck Chance Farm. Although the reputed owner of Buck Chance Farm was Toni Menzella, Poole received all of his instructions from petitioner and all bills which he submitted to the farm were paid by petitioner. In September petitioner *334 purchased from Wilson a racehorse named Jim French for $60,000. Payment was made by two checks, in the amounts of $10,000 and $50,000, paid on September 24, 1970 and December 1, 1970 respectively. Wilson subsequently returned $10,000 to petitioner and at the same time got a verbal commitment from petitioner that he would be permitted to buy back a one-half interest in Jim French if the horse were successful. Previously, in July of 1970, petitioner met Frank Caldwell (hereinafter Caldwell) when petitioner became a customer of Caldwell's furniture store located in Roslyn, New York. Petitioner spent approximately $34,000 for furniture to be delivered to his home in Muttontown. Petitioner inquired whether Caldwell would be interested in getting involved with horses, and sometime thereafter, Caldwell bought a horse, Casa Orange, from petitioner. In September of the same year Caldwell bought Marriage Encounter from petitioner. In October Caldwell purchased from petitioner interests in three horses, including Jim French. Those interests are as follows: Horses
Percentage
Sale Price
Jim French
25
$60,000.00
Thousand Ships
50
5,000.00
Fleet Lad
100
20,000.00
The terms of payment for these horses were *335 that Caldwell would pay $25,000 at the time of signing the contract of sale and the remaining $60,000 would be paid on or before December 29, 1970. The first payment was made by Caldwell by check in the amount of $25,000. [6]
After petitioner's purchase of Jim French, the horse was entered in and won purses in the following races: Race or Track
Date
Total Purse
Champagne Stakes
10/09/70
$20,000.00
Belmont
10/16/70
3,075.00
Remson Stakes
11/27/70
18,000.00
Garden State
10/24/70
3,300.00
Garden State
11/04/70
4,000.00 Beginning in October Caldwell was listed as owner of record of Jim French. The horse ran under Caldwell's name as if Caldwell had 100 percent ownership of the horse. After Jim French finished third in the Champagne Stakes, Wilson decided that, pursuant to his oral agreement with petitioner, he wanted to repurchase *336 an interest in the horse. When Wilson called petitioner to exercise his option, petitoner informed him that substantial interests in the horse had been sold to other people, including Caldwell. Nevertheless petitioner apparently demonstrated a willingness to discuss the matter with Caldwell and get back to Wilson with respect to the availability of a share in the horse. Petitioner held himself out as the liaison between Wilson and Caldwell; in this capacity petitioner made available to Wilson additional interests in Jim French. The pattern of the sales did not vary. Initially Wilson would contact petitioner, express interest in purchasing an additional interest in Jim French, and petitioner would indicate that he would relay the offer to Caldwell. Subsequently petitioner would call Wilson back and advise whether or not Caldwell accepted the offer. Caldwell always accepted the offer and Wilson would write a check to Caldwell transmitting the amount of the purchase price. Using Caldwell as his strawman, petitioner sold 55 percent of the interest he owned in Jim French to Wilson. Caldwell never actually sold any interest that he owned. Rather, he acted as a conduit for money transmitted *337 in connection with the purchase of interests in Jim French from Wilson to petitioner. In October Caldwell received the first payment from Wilson in the amount of $75,000 for the purchase of a 25 percent interest in Jim French. Caldwell deposited this check into his checking account. Acting on instructions from petitioner, Caldwell then drew a check on that account for $75,000 payable to Toni Menzella. On another occasion Caldwell deposited a $10,000 check from Wilson into the bank account of Society Custom Builders, a corporation formed by petitioner, Caldwell, and another. The check was deposited into the corporate bank account at petitioner's direction. Caldwell at times simply cashed the checks and handed over the proceeds to petitioner. The payments were as follows: Date of Wilson's Check
Amount
Payee
11/06/70
$16,000
Frank Caldwell
11/12/70
20,000
Frank Caldwell
12/02/70
20,000
Frank Caldwell
12/11/70
25,000
Frank Caldwell All in all, in 1970, petitioner sold the following interests in Jim French: Percent
Buyer
Price
25
Frank Caldwell
$60,000
55
Ralph Wilson
166,000
10
Mario Biundo
20,000
During the year, petitioner also incurred gains or losses, measured by the difference between the stated purchase *338 and sales prices, on each of the below listed horses: Purchase
Sales
Gain or
Horse
Price
Price
Loss
Chieftain,
Circus Paint
$14,000
$19,100
$5,000 Bijou Baby
7,000
7,500
500 Lamorna
8,500
7,500
(1,000) Fleet Lad
24,600
20,000
(4,600)
Thousand Ships
9,500
5,000
(4,600)
Strider
30,000
30,000
Proper Lady
2,000
3,666
1,666 Sure Pop
2,000
3,666
1,666 Two Fer
2,000
3,666
1,666 Running Bear
25,000
25,000
Sage Green
20,500
15,000
(5,000)
Raise A
Native Season
25,000
25,000
Native Trap
31,000
30,000
(1,000)
Captain Nash
14,000
25,000
11,000 Graustark Season
1,500
20,000
18,500 Restless Wind/
Be Suspicious
5,000
5,000
Olden Times/
Golden Heels
5,000
5,000
Shimmering Star
20,000
15,000
(5,000)
Casa Orange
10,000
10,000 Marriage Encounter
10,000
15,000
5,000 Sea Pac
30,000
50,000
20,000 Conceited
3,710
(3,710)
Cold Showers
8,500
8,000
( 500)
Jack Teal
8,500
6,000
(2,500)
Princess Antea
4,500
4,000
( 500)
Fleet Hal
20,000
20,000
Graustark Share
44,500
45,000
500 Raise a Native
Season
7,500
11,000
3,500 Seabird Season
20,000
20,000
Petar Shimmering
Star/Running the
Show
25,000
2,500
(22,500) In addition, during the year, petitioner bought the horses listed below from Wilson. They were paid for by checks which were dated in the year 1971; the checks were ultimately returned unpaid by the bank. Petitioner *339 closed his account on which the checks were drawn in October of 1971. Date of
Date of
Horse
Purchase
Check
Amount
Chieftain Share
06/25/70
04/16/71
$15,000
Fleet Nasrullah
Share
07/03/70
05/16/71
15,000
06/16/71
10,000
Vertex/Shimmering
09/11/70
09/16/71
10,000
Star
10/16/71
10,000
Hail to Reason/
My Sore
08/27/70
11/16/71
15,000
Filly By Candy Spots
Out of Parfait
1970
07/16/71
10,000
In the fall of 1970, petitioner bought a house at 1 Ripley Lane, Muttontown, New York for $140,000. The deed to the propert indicated that the property was conveyed from Mario Biundo to Caldwell. Caldwell had no actual interest in the property but merely acted as nominee for petitioner. The house was purchased subject to a $90,000 purchase money mortgage taken back by Biundo. In December 1970, Caldwell and Biundo agreed to extinguish the $90,000 mortgage held by Biundo in exchange for a $40,000 payment to Biundo plus a transfer to him of a 5 percent interest in Jim French and a 100 percent interest in the horse Native Trap. Those interests were supposed to be worth $10,000 and $30,000 respectively. The $40,000 was paid by petitioner to Biundo and was made up of cash and a cashier's check in the amount of $18,200. Caldwell purchased *340 the cashier's check with money provided by petitioner. During 1970, petitioner earned purses in the following amounts from races won by horses he owned: Race or
Total
Petitioner's
Horse
Track
Date
Purse
Share
Champagne
Jim French
Stakes
10/10/70
$20,000
$15,000
Jim French
Belmont
10/16/70
3,575
2,683
Jim French
Remsen
11/27/70
18,000
3,672
Stakes
Jim French
Garden
10/24/70
3,300
2,475
Stakes
Jim French
Garden
11/04/70
4,000
800
Stakes
Otesaga
Aqueduct
11/06/70
3,600
1,800
Otesaga
Aqueduct
11/14/70
1,140
570
Otesaga
Aqueduct
11/28/70
1,200
600
Change of
Scenery
Tropical
12/24/70
440
220
Running
Bear
Tropical
09/18/70
4,500
4,550
During 1970 petitioner accrued purses totaling $32,370. Other Business and Banking Transactions
In September of 1970, petitioner incorporated Society Custom Builders, Inc. in New York. The principal place of business was 1 Ripley Lane, Muttontown, N.Y., petitioner's residence. The purpose of the corporation was to build a house at 1 Ridge Lane, Mill Neck, New York. The officers of the corporation were president, Julia Presti, petitioner's sister, Fred Cole, vice-president, and Frank Caldwell. The stockholders of the corporation were petitioner, Cole, and Caldwell. Although Julia Presti was the named president she was *341 merely the nominee for petitioner. Caldwell invested approximately $40,000 in the corporation, Cole's contribution was his construction skill, and petitioner contributed between $80,000 and $85,000 to the corporation. The corporation built a house at 1 Ridge Lane which it never sold. Petitioner moved into the house in 1971, but never actually purchased the house from the corporation. In February of 1970 petitioner opened checking account number XXX-X847-2 in the Security National Bank in Huntington, New York. From February through August of that year petitioner made net deposits in the amount of $369,009.67. In August 1970 petitioner opened checking account number XXX-X9428 at the Security National Bank in Huntington, New York. From August to December of that year petitioner made net deposits to the account in the amount of $371,119.37. During the year petitioner also opened a stock brokerage account, number XX-6506, at Hayden Stone, Inc. Petitioner made purchases and sales of stock in the amounts of $73,481.02 and $69,612.04 respectively. Petitioner's Guilty Plea.
On April 11, 1977, petitioner was convicted on a plea of guilty in the United States District Court for the District *342 of New Jersey of violating section 7206(1) for the year 1970. At the plea proceeding, petitioner offered the following explanation: In 1970, I was advised by a C.P.A., a man by the name of Otto Weiner, who is a president of a bank in Jersey City, that I did not have to put down my losses on my tax return because that was considered a hobby loss, and the fact I had nothing --you couldn't take the loss anyhow. He had told me that in 1969 and he told me that in 1970, earlier in 1970, in January. Income:Further Findings and Analysis
Petitioners argues that respondent is charging petitioner with income he never received or accrued. Respondent argues that petitioner failed to report all gain realized from horses petitioner owned during the year. Petitioner and respondent agree on the income for which petitioner may be charged on many of the transactions during the year. We will address separately the disputed items presented. The first dispute centers on the horse Sea Pac which petitioner received from Wilson. In July of 1970, petitioner bought the horse Strider from Wilson for $30,000 for Buck Chance Farm. He later traded Strider for Sea Pac; on September 30, 1970, Sea Pac died. *343 Livestock Underwriter's Inc., a horse insurance brokerage firm which had insured the life of Sea Pac, paid $50,000 to Buck Chance Farm. The $50,000 was eventually paid over to petitioner. Petitioner merely used Buck Chance Farm as a protective barrier between his horse transactions and himself. He admitted to Wilson when he bought Strider that he wanted the invoice made out to "George Poole c/o Robert Presti, Raintree Farms" for tax purposes. Later when petitioner had other invoices made out to his niece at Buck Chance Farms he admitted again that his motivation was tax purposes. Clearly, petitioner controlled Buck Chance Farms, the horses, and ultimately the insurance proceeds. Since petitioner's basis in Sea Pac, under section 1031(d), would be $30,000, his basis in Strider, petitioner must realize the $20,000 gain. [7]
We next consider Casa Orange and Marriage Encounter. The parties agree that the purchase price for Casa Orange was zero. We must determine what the sales price of the horse was and when it was sold to Caldwell. While *344 Caldwell was evasive as to where he received his funds to buy Casa Orange, and we give little weight to his testimony, the independent evidence clearly establishes that Caldwell bought the horse from petitioner for $10,000. Two checks from Caldwell to petitioner were submitted, each for $5,000. One of the checks contained the notation "bal on Case Orange." Caldwell reported on his 1970 income tax return that the cost basis in Casa Orange was $10,000. This evidence corroborates Caldwell's account of the transaction. Even if we were to discount entirely Caldwell's testimony, petitioner came forward with no persuasive evidence to prove that Caldwell paid less than $10,000. Therefore, petitioner must recognize a gain of $10,000 on the sale of Casa Orange. As with Case Orange, the parties agree that the purchase price of Marriage Encounter was $10,000. The only remaining issue is the sales price of the horse. Petitioner also sold this horse to Caldwell; Caldwell testified that he purchased the horse for $15,000. A contract of sale naming the price as $15,000 was submitted, as well as Caldwell's Federal income tax return for 1970 which lists the cost basis on this horse as $15,000. *345 The accumulated evidence, independent of Caldwell's testimony, establishes the sales price as $15,000. The next three horses, Chieftain Share, Fleet Nasrullah Share, and Vertex/Shimmering Star, were all bought by petitioner from Wilson in 1970 with post dated checks (dated 1971). There is no disagreement as to the purchase price or sales price for any of the horses. They are as follows: Horse
Purchase Price
Sales Price
Chieftain Share
$15,000
$11,000
Fleet Nasrullah
Share
27,500
23,000
Vertex/Shimmering
Star
20,000
15,000
The only issue to be decided is petitioner's cost basis in the horses. The post dated checks used to pay for the horses were drawn on the checking account which petitioner closed before Wilson presented the checks for payment. Subsequently litigation ensued between petitioner and Wilson, resulting in a judgment for Wilson in the amount of $129,000. This judgment remains unpaid because petitioner contends that it is not due and owing to Wilson. Gain or loss on a sale or exchange of property equals the amount realized minus the basis of the property sold or exchanged. Sec. 1001. A taxpayer's basis for determining gain or loss includes liabilities incurred in acquiring the property. *346 Commissioner v. Tufts,461 U.S. 300, 307-308 (1983). [8] The liability incurred must be fixed in order to be used in determining basis. [9] Section 461 permits a taxpayer to claim the amount of any allowable deduction for the taxable year which is proper; the proper taxable year is determined by the taxpayer's accounting method for determining taxable income.[10] Under the accrual method of accounting if a taxpayer disputes a liability then it is a contested liability, and it may not be deducted. United States v. Anderson,269 U.S. 422, 441 (1926); Consolidated Industries, Inc. v. Commissioner,82 T.C. 477 (1984). [11]
Petitioner argues that because he does not dispute *347 his obligation on the checks that his liability on them ought to be included in his basis in order to determine his gain or loss on the sale of these horses. Respondent, however, argues that petitioner does dispute his liability on the checks, and therefore the amount of liability was not fixed by the end of 1970 or 1971. The burden of establishing whether or not petitioner has admitted liability and that the liability is fixed is on petitioner. [12] Petitioner has not persuaded use that he admits his liability on the checks. He closed his checking account, litigated the issue of any obligation to Wilson, and contends still that he does not owe him $129,000. On brief, petitioner attempted to clarify his position; he contends that he disputes, not his obligation on the checks, but the amount he must pay Wilson because of an offsetting claim. Petitioner did not establish this contention at trial however. Petitioner has not established that the fact and the amount of the liability were fixed in 1970 or in 1971. See Security Flour Mills Co. v. Commissioner,321 U.S. 281 (1944). Petitioner contends that this case is similar *348 to Consolidated Industries, Inc. v. Commissioner,supra, where in determining whether or not the taxpayer had accrued a state tax deduction which was based on a Federal tax liability, we stated that, if the contests of liability for state and Federal taxes are substantially independent contests, then contest of one liability does not equal contest of the other. Consolidated Industries, Inc. v. Commissioner,supra at 481. Petitioner, however, misreads our statement. We were merely asserting a proposition to be examined in order to resolve the issue in the case, and further study of our opinion reveals that we concluded under the facts therein that the liabilities in question were related. Consolidated Industries, Inc. v. Commissioner,supra at 484. Thus even if we were to accept petitioner's claim that he disputes only the sum owed to Wilson, not his obligation on the checks, these two disputes are so inextricably intertwined that to dispute one amounts to a dispute of the other. Petitioner is attempting to add to the cost basis of these horses a sum of money which he did not in fact pay. The only fair treatment of petitioner's obligation on these horses is to disallow his use of *349 the contested amount of the checks as part of his basis. This accurately reflects the transaction. Petitioner has not paid the checks and denies that he owes Wilson the $129,000 judgment. Therefore, he has not definitely incurred the liability. He received the proceeds on the sale of these horses and used the proceeds for his own purposes. Yet he now seeks to escape tas liability on a portion of those proceeds, which he admits receiving, by claiming an increased basis in these horses. To permit petitioner to do so in this situation would result in unjustified tax windfall to him. See Redford v. Commissioner,28 T.C. 773, 778 (1957). The last horse to consider is Jim French. Petitioner purchased Jim French for $50,000. The parties agree that petitioner sold 90 percent of his interest in Jim French during the year for $246,000. Petitioner sold percentages of Jim French during the year in the following amounts: Percentage of
Purchase
Date
Jim French
Purchaser
Price
10/12/70
25
Frank Caldwell
$60,000
10/29/70
25
Ralph Wilson
75,000
11/06/70
10
Ralph Wilson
16,000
11/12/70
5
Ralph Wilson
20,000
11/20/70
10
Ralph Wilson
30,000
12/11/70
5
Ralph Wilson
25,000
12/11/70
5
Mario Biundo
10,000
12/30/70
5
Mario Biundo
10,000
The *350 details of the Jim French sale to Wilson have been set forth above. Petitioner argues that Caldwell did not turn over the entire amount of the proceeds from the sale of Jim French. Therefore, petitioner argues that he is entitled to a bad debt or a theft loss deduction for that year. Respondent argues that no misappropriation of funds occurred. Respondent argues in the alternative that even if the funds had been misappropriated, petitioner is not entitled to a theft loss or bad debt deduction. Petitioner has not proven that any funds were actually misappropriated. The only evidence he offered to prove that Caldwell did not turn over the entire amount of the Jim French proceeds was his self-serving testimony. Even if we give little or no weight to Caldwell's testimony regarding these transactions, the remaining evidence presented contradicts petitioner's version of events. It was petitioner who constructed the elaborately deceptive scheme whereby Caldwell pretended to own the shares of Jim French rather than petitioner. Caldwell never actually sold any interest owned by him to Wilson. Furthermore, petitioner was consistently portrayed during trial as quick-tempered and hot headed. *351 Indeed petitioner himself admitted that he could be spiteful and emotional at times. Given this portrait of petitioner, one offered by him, it is hardly likely that petitioner would continue to be a business associate of Caldwell after Caldwell had allegedly stolen at least $61,000 in proceeds. Petitioner never filed a criminal complaint against Caldwell. While petitioner did bring two civil actions against him neither suit was brought to completion. Petitioner dropped both suits before any final judgment was entered, ostensibly because petitioner ran out of money to continue with the cases. The evidence shows that petitioner and Caldwell continued to enter into business arrangements together. In November, Caldwell acted as petitioner's nominee on property petitioner purchased at 1 Ripley Lane in Muttontown, New York. In December, Caldwell and Biundo entered into a contract to extinguish the mortgage on the property. The money used to extinguish the mortgage was given to Caldwell by petitioner. If Caldwell had been withholding money from petitioner we doubt that petitioner would have entrusted Caldwell with an $18,200 cashier's check. Similarly, in January of 1971, petitioner *352 asked Caldwell to report on his Federal income tax return the Jim French prize winnings. In return for his agreement to pay the taxes on the winnings, petitioner gave Caldwell a 5 percent interest in Jim French. In February Caldwell again acted as petitioner's strawman, this time in petitioner's repurchase of an interest in Jim French. It is inconceivable that petitioner, a businessman, would continue to include in his affairs a man who had been stealing from him. Petitioner's story defies logic and good business sense. Instead we believe that the entire circumstances surrounding the transactions, and petitioner's continued relationship with Caldwell, establish that petitioner actually received this income. Petitioner's incredible assertions that Caldwell stole funds from him, yet they continued to be linked in business, is not enough to carry his burden of proof on this issue. Burnet v. Houston,283 U.S. 223 (1931). [13] *353 Since we have determined that petitioner did actually receive this income for 1970, he is not entitled to any theft loss or bad debt deduction as a result of the Jim French sale. Finally, petitioner also argues that Caldwell never paid him $60,000 for the purchase of Caldwell's own 25 percent interest in Jim French. Petitioner points to his suit against Caldwell to establish that Caldwell did not pay petitioner this money. A business bad debt may be deducted in the year in which the debt becomes worthless. Sec. 166(a). In order to be allowed this deduction, a taxpayer must exhaust the usual and reasonable means of collection. C.S. Webb, Inc. v. Commissioner,1 B.T.A. 269 (1925). When efforts to collect become futile, then the deduction is allowed. Alexander v. Commissioner,26 T.C. 856 (1956). [14] Petitioner dropped his suit against Caldwell because he had no way to prove Caldwell had not actually paid him the $60,000. Petitioner's claim fails *354 again for the same reason. Petitioner is not entitled to a bad debt deduction under section 166(a) because he has not proved any debt actually existed. Caldwell claims he paid the money, petitioner denies it. We are not inclined to credit either witness' testimony, and petitioner has come forward with no other persuasive evidence to meet his burden of proof. [15] *355 Petitioner also claims that he is entitled to a theft loss deduction for purse winnings in the amount of $35,525 which Caldwell never turned over to him. A taxpayer is allowed a theft loss deduction in the year in which the loss is discovered and where the loss is unrecoverable. Section 165(a) and (e). Petitioner has, however, failed to prove that Caldwell misappropriated any purse winnings which belonged to petitioner. Since petitioner failed to meet his burden of proof he cannot deduct this amount as a theft loss. Finally, petitioner also claims that he is entitled to a bad debt deduction in the amount of $104,000 from Caldwell.This debt allegedly arises from the sale of Jim French to Daniel Wildenstein (hereinafter Wildenstein) when petitioner supposedly paid off a lien on Jim French which was placed on the horse as a result of a loan taken out by Caldwell. We note, however, that it is quite unlikely petitioner would pay off this lien and still allow Caldwell to receive his 25 percent of the sale proceeds. Moreover, we decline to consider this issue since the evidence was submitted for consideration *356 in connection with the fraud issue only. [16]
Expenses:Factual Background
Petitioner claimed as business expenses and as itemized deductions for 1970, and respondent allowed, amounts as follows: [17]
Amount
Amount
Item
Claimed
Allowed
Telephone Expenses
$4,725.57
Insurance Premiums
2,481.00
Shipping costs
1,283.40
Veterinary & Blacksmithing
Fees/Horse Equipment
930.45
Licensing Fees
60.50
Miscellaneous
1,900.71
Jockey Fees/Training Expense
1,401.78
Entertainment & Transportation
Expenses [18]
48,866.94
Charitable Contributions
30.00
Board, Feed, Jockey Fees &
Training
29,383.00
Entry Fees, Starts, etc.
4,886.00
Other Expenses [19]
1,934.11
Expenses:Findings and Analysis
We must decide whether *357 petitioner is entitled to business expense deductions in excess of those allowed by respondent. Respondent asserts that petitioner is not entitled to any additional deductions beyond those already allowed and to which he has conceded. A taxpayer may deduct expenses incurred during the taxable year which are ordinary and necessary. Section 162. Deductions are a matter of legislative grace, and petitioners must prove their entitlement thereto. New Colonial Ice Co. v. Helvering,292 U.S. 435 (1934); Rule 142(a). Petitioner has proven his entitlement to some of the claimed business expenses; however, petitioner has not proven the entire amount claimed in all cases. Since he has proven he incurred some of these expenses, part of which were for business, the Court may determine what portion of the expenses are deductible where petitioner is not required to substantiate expenses under section 274. Cohan v. Commissioner,39 F.2d 540 (2d Cir. 1930). We examine first petitioner's claimed deduction for telephone expenses. [20] Petitioner submitted copies of his telephone bills and cancelled checks as proof of his expenses. While petitioner has not provided a clear allocation of what portion *358 of the bills were business and what portion were personal calls, we are satisfied that a portion of the calls were business related. While incidental business use of a home telephone, without additional cost, would not convert an otherwise personal expense into a business expense, the evidence here indicates that petitioner made a substantial number of long distance calls. The telephone bills totalled approximately $4,800 for the year. Telephone business calls are deductible under section 162. Laurano v. Commissioner,69 T.C. 723 (1978)[21]. Using our best judgment, we find that petitioner is entitled to deduct $2,400, which is one-half of his claimed expense. Cohan v. Commissioner,supra, at 543. Next we turn to petitioner's claimed deductions for insurance premiums. Petitioner states that he paid insurance premiums *359 for livestock casualty coverage, liability, and workers' compensation. Respondent argues that petitioner has not met his burden of proof on this issue, and that these expenses have been allowed in the statutory notice of deficiency. Insurance premiums are a deductible expense under section 162. See Sec. 1.162-1(c), Income Tax Regs. Petitioner has failed to delineate what amounts he spent for insurance during the year. Petitioner testified at various points, in connection with other issues, that his horses were insured but offered no testimony as to the 1970 insurance premiums paid. Petitioner did, however, submit copies of his insurance receipts for premiums paid in 1970 for Hartford Accidental and Indemnity Liability Insurance. Since these are the only premiums we are certain petitioner paid, petitioner is allowed a deduction for $152. Petitioner also seeks a deduction for shipping costs paid for transporting horses. Respondent argues that petitioner has not proven that these costs have not already been allowed by respondent. Shipping costs are ordinary and necessary business costs. Doornbosch Bros., Inc. v. Commissioner,46 T.C. 199 (1966). It is clear from the face of the *360 exhibits submitted that these expenditures are related to petitioner's business. In addition petitioner claims a deduction for veterinary fees, blacksmithing fees, and horse equipment fees. Petitioner submitted receipts and cancelled checks documenting the claimed expenses. It is clear that these expenses are business related, and would be ordinary and necessary. See Sonnabend v. Commissioner,377 F.2d 42 (1st Cir. 1967); sec. 1.162-4, Income Tax Regs.
With respect to the shipping costs and veterinary fees, petitioner has failed to prove that these are legitimate business expenses which are not duplicative of those already allowed by respondent. Petitioner did no more to prove he incurred these expenses than to provide bills and receipts. He did nothing to differentiate these expenses from those allowed in the statutory notice. Since respondent's determinations are presumptively correct, and petitioner has not met his burden of proof on these issues, petitioner is not permitted an additional expense deduction for these expenses. Burnet v. Houston,283 U.S. 223, 227 (1931). Petitioner claims various miscellaneous expenses for professional publications, dues, promotional expenses, *361 printing, and photography. As with his prior claims, petitioner offered receipts and checks as his only evidence to prove that he actually incurred these costs. It is obvious from some of the receipts that these were business related expenses. We will address ourselves to whether they are ordinary and necessary expenses under section 162. Petitioner claims a $40 deduction for money paid to the Florida State Racing Commission. Licensing fees incurred in carrying on a trade or business are ordinaryd and necessary expenses. [22] Therefore, petitioner is entitled to deduct this expense. Additionally petitioner claims as deductions his subscription fee to the Thoroughbred Record and photo costs paid to Kunkel Photos for pictures of some of his horses. Expenses for subscriptions to trade and professional magazines which are related to the conduct of a taxpayer's business are deductible. Kasey v. Commissioner,54 T.C. 1642 (1970), affd. 457 F.2d 369 (9th Cir. 1972), cert. denied 409 U.S. 869 (1972). The subscription to the Thoroughbred Record is an ordinary and necessary expense, and petitioner is entitled to deduct its cost. The photo expenses are similar to advertising expenses, which *362 are deductible under section 162. Therefore, petitioner is also entitled to deduct the fees he paid to Kunkel Photos. See Alexander Sprunt & Son, Inc. v. Commissioner,24 B.T.A 599 (1931). As for the remaining miscellaneous expenses, we find that petitioner did not meet his burden of proof. Burnet v. Houston,supra. Petitioner failed to demonstrate whether these were personal or business expenses, or the relationship, if any, they had to his business. Petitioner claims that he is entitled to additional expenses for jockey fees and training expenses for the year. In the statutory notice respondent did allow petitioner a deduction for these expenses. The burden of proving he is entitled to additional expenses in excess of those allowed by respondent is on petitioner. Welch v. Helvering,290 U.S. 111 (1933). [23] Petitioner and other witnesses offered general testimony regarding these expenses but their testimony does not fulfill petitioner's burden of proof. Since petitioner has not met his burden of proof, his claim for a greater deduction is denied. The *363 next set of business expense deductions sought by petitioner are entertainment expenses. He claims these expenses for both 1970 and 1971. In the statutory notice of deficiency for 1971 respondent disallowed petitioner's claimed deduction of $33,409.15 for entertainment. Respondent asserts that petitioner is not entitled to these deductions for both years. Petitioner claims that money he spent entertaining at the Villa Pierre restaurant, the Carlysle Hotel, as well as liquor bills to area liquor stores, all qualify as business entertainment deductions. In addition petitioner seeks to deduct money spent on limousines and cabs. Respondent asserts that none of these expenses are ordinary or necessary expenses under section 162. In the alternative he argues that if we were to find that they qualify as business expense deductions under section 162, that petitioner has failed to meet the substantiation requirements of section 274. Petitioner has not apportioned any of his entertainment expenses as personal. He has not demonstrated what amounts constitute the actual business expenses. Under sections 162 and 274 the burden is on petitioner to provide this information. He has ignored *364 entirely the requirements under section 1.274-5(b) and (c), Income Tax Regs.
In order for these expenses to be deductible they must qualify as ordinary and necessary expenses, as well as being proximately related to petitioner's trade or business, under section 162. This is primarily a factual question. Henry v. Commissioner,36 T.C. 879, 883 (1961). Petitioner urges on us the notion that entertainment such as the kind in which he indulged was ordinary and necessary in order for him to conduct his business successfully. He argues that in the horse industry business was normally conducted in these settings and that, unless petitioner entertained on the scale he did, he would have been unable to attract clients. Nevertheless, we are skeptical of this rationale as a basis for permitting a business expense deduction. See, Fihe v. Commissioner,265 F.2d 511 (9th Cir. 1958).In view of petitioner's inadequate record keeping, we can make no finding as to whether his claimed expenses are actually ordinary and necessary business expenses. Even if we were to find that the expenses qualify under section 162, the only evidence produced has been the total expenditures for liquor, restaurant, *365 hotel, limousine and cab service for 1970 and some receipts for 1971. Petitioner testified generally as to the scale of his entertainment costs, as did one or two other witnesses. None, however, could provide specific information in detail as to the claimed expenditures. Even if we were to totally accept all of the offered testimony, it established only the place of the entertainment, the type of liquor served and that limousines and cabs were provided.No evidence was offered to provide the missing elements. The substantiation requirements of section 274(d) are quite strict. Petitioner must provide specific information about the entertainment expenses such as amount, time, place, business purposes, and business relationship of the taxpayer to the persons entertained. Sec. 1.274-5(b), Income Tax Regs.Furthermore, petitioner must provide adequate records or sufficient evidence to substantiate the deduction. Sec. 1.274-5(a), Income Tax Regs. Petitioner has acknowledged that he is a poor record keeper and this failure to keep adequate records prevented petitioner from substantiating properly and of his claimed entertainment expenses. Section 274 was intended to disallow deductions *366 based on a taxpayer's unsupported and self-serving testimony. The statute requires specific information, not estimates. Therefore we have no alternative but to deny petitioner's entertainment expenses for both years. Dowell v. United States,522 F.2d 708 (5th Cir. 1975) cert. denied 426 U.S. 920 (1976); Foster v. Commissioner,80 T.C. 34, 234 (1983), affd. in part and vacated in part 756 F.2d 1430 (9th Cir. 1985)[24]. Petitioner also seeks a deduction for home office expenses for 1970 and 1971. Petitioner claimed eligibility for this deduction for the first time on post trial briefs. This issue has not been properly pleaded, nor have the parties expressly or impliedly consented to try the issue. Whether or not the issue has been properly raised depends upon whether the opposing party has been given fair notice of the matter in issue. Rule 31(a). We must determine whether respondent was surprised and put at a disadvantage because petitioner raised the home office deduction on his post trial brief. In neither the pleadings, nor in petitioner's *367 opening statement, was respondent informed that petitioner was claiming this deduction. Evidence was presented that petitioner worked at home, but he was never questioned or cross-examined on the issue. [25] Since this is not an issue which is properly before the Court, we will not consider it. See Markwardt v. Commissioner,64 T.C. 989 (1975); Estate of Mandels v. Commissioner,64 T.C. 61 (1975); Estate of Horvath v. Commissioner,59 T.C. 551 (1973); Frentz v. Commissioner,44 T.C. 485 (1965), affd. 375 F.2d 662 (6th Cir. 1967). Petitioner also claims a charitable contribution deduction for money contributed to the American Cancer Society and the Tuberculosis Respiratory Disease Association. Petitioner's contributions amounted to $30. Respondent argues that these deductions were already allowed in the statutory notice of deficiency. These items are deductible under section 170(a) and (c)(2). However, petitioner has not shown that these deductions were not allowed by respondent. Having failed to meet his burden of proof, petitioner is not allowed these *368 additional deductions. American Pipe and Steel Corp. v. Commissioner,243 F.2d 125 (9th Cir. 1957). Taxable Year 1971
Income:Factual Background
Jim French Sale
In January of 1971 petitioner sold an additional 10 percent interest in Jim French to Wilson. This transaction followed the form of previous ones. Wilson sent a $1,000 check to Caldwell, dated January 18, 1971 and payable to Caldwell. Caldwell cashed the check and turned the proceeds over to petitioner. During this month, petitioner and Caldwell also agreed that Caldwell would receive an additional 5 percent interest in Jim French in exchange for agreeing to cover payment for all of the 1970 taxes due on the horse's winnings. Caldwell agreed to the arrangement with the proviso that he would not have to report anything over $45,000. In February of 1971 Wilson discovered that a 10 percent share of Jim French had been sold by petitioner in 1970 to Mario Biundo. Wilson learned that Biundo's creditors in Florida were prepared to attach the horse in order to secure their payment. Fearing potential embarrangement Wilson offered to buy Biundo's 10 percent interest. Before any formal arrangement to purchase was made, Wilson's *369 horse brainer informed Wilson that Jim French had a chipped bone in his knee. Wilson then decided to bailout entirely from ownership in Jim French. Wilson told petitioner that if he knew anyone who wanted to buy his share in the horse, Wilson would sell. Petitioner later informed Wilson that Caldwell wanted to buy Wilson's 60 percent interest in Jim French for $140,000. Petitioner again set up a strawman transaction using Caldwell as the conduit. The deal called for Caldwell to give Wilson 14 monthly checks in the amount of $10,000 each. The closing took place in February at petitioner's home. Wilson gave petitioner the bill of sale and petitioner gave Wilson the 14 checks. Caldwell was not present at the closing; however, at about the same time Caldwell received 14 promissory notes from petitioner each in the amount of $10,000. As the checks became due Caldwell used the $10,000 promissory notes as funding. Petitioner also purchased in February an additional 10 percent interest in Jim French from Biundo for $20,000. After petitioner repurchased Wilson's 60 percent share, Jim French finished in the money 14 times between March 10, 1971 and July 10, 1971. Later in the year, *370 in September, petitioner sold his 70 percent interest in Jim French to Wildenstein for $750,000. The sale of this 70 percent share of Jim French was also conducted through a straw. Fred Cole acted as petitioner's nominee and signed the contract with Paul Arnold, Wildenstein's representative. Petitioner was present, however, at the time the contract was signed. After the signing petitioner paid Cole $5,000 for his part in the transaction. The proceeds of the sale, which were received either in the form of a check or checks, were deposited in a bank account bearing Cole's name. The bank account was opened not long before the sale of the horse and was opened for the purpose of depositing the Jim French sale money. Further Findings and Analysis
Petitioner claims a deduction in the amoung of $150,000 as a commission paid to Paul Arnold on the sale of petitioner's interest in Jim French. Respondent argues that this item is not an ordinary and necessary business expense under section 162. Respondent further argues that if such payment does constitute an ordinary and necessary business expense petitioner has not substantiated that any amount was incurred or paid by petitioner. According *371 to the contract of sale of September 1971 Paul Arnold acted as agent for the buyer. While the sales price in the contract is reflected as $470,000 the parties have agreed that the actual sales price was $750,000. Although the sales contract provides for payments to some parties there is no provision for any payments to Paul Arnold. Petitioner testified that he paid Paul Arnold the $150,000 in cash at a meeting at petitioner's home on September 17, 1971. The $150,000 deduction was not claimed by petitioner on his 1971 return. Nor was it claimed on his amended return. Petitioner first claimed entitlement to the deduction in 1979 during discussions and negotiations with representatives of the Internal Revenue Service. Section 162(a) Provides for a deduction for all the ordinary and necessary expenses paid or incurred in carrying on a trade or business. Walliser v. Commissioner,72 T.C. 433, 437 (1979); Herman v. Commissioner,84 T.C. 120 (1985). The burden of proof is on petitioner to establish entitlement to the claimed deduction. Welch v. Helvering,290 U.S. 111, 115 (1933); Rule 142(a). Respondent's determination is presumptively correct. Upon review of the entire record we *372 are satisfied that the $150,000 payment by petitioner to Paul Arnold (assuming arguendo that the payment was actually made) [26], does not constitute an ordinary and necessary business expense. The payment here was not claimed on petitioner's original or amended income tax returns for 1971. It was not until 1979, well into the examination and administrative process, that petitioner first claimed the deduction. The alleged $150,000 payment was made secretly and deceptively. The payment was made in cash approximately 10 days after the sale and after money relating to the sale was transferred.There is insufficient evidence of what services Paul Arnold, as agent for the buyer, performed to warrant a $150,000 commission to be paid to the seller. The record is lacking proof that the payment if actually made was customary or normal in the horse racing business. Deputy v. duPont,308 U.S. 488, 494-495 (1940); Diamond v. Commissioner,56 T.C. 530, 542 (1971), affd. 492 F.2d 286 (7th Cir. 1974); Kalamazoo Oil Co. v. Commissioner,T.C. Memo. 1981-344, affd. per curiam 693 F.2d 618 (6th Cir. 1982); Boser v. Commissioner,77 T.C. 1124 (1981) (see also 79 T.C. II), affd. in an unpublished opinion *373 (9th Cir. Dec. 22, 1983). Accordingly, petitioner is not entitled to the claimed deduction. Petitioner also argues that he is entitled to make additional claims relating to expenditures he allegedly incurred on the sale of Jim French. Thus, the amount which petitioner would recognize on the sale would decrease. These claims were not raised in the petition, nor could one infer from the petition that these claims existed. Several days before trial, during the stipulation process, petitioner first advised respondent that he would advance these claims. Petitioner claims that, in connection with the sale of Jim French, he made (1) a $25,000 payment to Mr. Savin to repurchase a breeding *374 share in the horse; (2) a $35,000 payment to Wildenstein in compensation for a breeding share in the horse which one Mrs. Love would not sell to petitioner, and (3) that he paid about $100,000 in connection with an alleged lien on the horse, including legal costs. Respondent argues that he was surprised by the addition of these claims and that he would be prejudiced if petitioner were allowed to reframe the issues on the eve of the trial. We ruled at the commencement of the trial that petitioner could introduce evidence on these claims in an attempt to mitigate fraud, but we withheld our decision as to whether we would consider petitioner's additional claims. It is within the Court's discretion to determine whether or not a petitioner will be entitled to amend his or her petition. Rule 41. We will not allow a new issue to be raised where it will cause surprise or prejudice to one of the parties. See e.g., Estate of Horvath v. Commissioner,59 T.C. 551 (1973); California Brewing Assn. v. Commissioner,43 B.T.A. 721 (1941), affd. per curiam 129 F.2d 321 (9th Cir. 1942); Helvering v. Edison Securities Corp.,78 F.2d 85 (4th Cir. 1935). Furthermore, we have repeatedly held that the Court *375 will not consider issues which have not been properly pleaded. See, Markwardt v. Commissioner,64 T.C. 989 (1975); Estate of Mandels v. Commissioner,64 T.C. 61 (1975); Frentz v. Commissioner,44 T.C. 485 (1965), affd. 375 F.2d 662 (6th Cir. 1967). Petitioner argues that because these claims he now pursues are all based on language contained in the contract of sale for Jim French that these are not new issues; that respondent should have known about the additional expenditures because he had the contract and had the ability to search public records for any further information; and finally he argues that there issues were tried by consent of the parties. Respondent argues that the petition clearly framed the issues and thus the sole issue for consideration is the characterization of the gain on the sale of the horse. We agree with respondent. Clearly this is not an issue which has been tried by consent. Given the extensive discussion held at the beginning of the trial and the Court's initial ruling, petitioner is incorrect in asserting that this issue has been tried by consent. We find that petitioner's failure to raise these new issues within a time frame which would have allowed *376 respondent to investigate and prepare the new issue unfairly prejudices respondent. Both parties had copies of the contract of sale between Wildenstein and petitioner, but this was not enough to put respondent on notice that petitioner would make additional claims which could potentially reduce the amount petitioner realized on the sale of the horse. Between the filing of the petition and commencement of the trial nearly five years had elapsed. Petitioner should not have waited until just before trial to inform respondent of his additional claims. Where the new issue is essentially a factual one, as is the issue here, it is up to petitioner to make respondent aware of his position well before the eve of trial. Thus, we stand by our rules of pleading, which require that a petitioner raise an issue in his petition or amend his petition. See, e.g., Estate of Mandels v. Commissioner,supra at 73. Raising these issues only a few days before trial stymied any chance that respondent could adequately prepare and present his case on the issues. These simply are not claims respondent should have been expected to meet without some indication, well in advance of trial, that these expenditures *377 were an issue in the case. Cf. Grow v. Commissioner,80 T.C. 314 (1983). (Court allowed respondent to advance new theory at trial because it was not a new matter, therefore there was no surprise). We therefore do not consider the question of the additional expenditures allegedly incurred by petitioner in the sale of Jim French. We now take up the question which we must address with regard to this horses; that is whether petitioner is entitled to treat the amount realized on the horse's sale as a long term capital gain. Petitioner argues that because he bought Jim French in 1971 primarily for promotional purposes and with the knowledge that the horse was badly damaged, that the horse was not part of his stock in trade. Rather, he argues that the horse was property used in petitioner's business and was deprecisable under section 167. He claims, therefore, that the sale of the horse qualifies under section 1231(a) for treatment as a long term capital gain. Respondent, on the other hand, argues that the horse was neither a capital asset as defined by section 1221, nor does it qualify for capital gain treatment under the provisions of section 1231. The parties stipulated that petitioner's *378 primary business was buying and selling thoroughbreed horses. Petitioner originally bought Jim French in 1970 and then sold various interests in him during the year in the course of his business. Yet he contends that in 1971 he bought the horse as a promotional device to establish himself in the business. The purpose for which petitioner acquired the property is not necessarily the controlling factor. It is a consideration, but whether a taxpayer holds property for sale to customers in the ordinary course of his business, or holds it for some other purpose, is a question of fact to be determined from the totality of circumstances in each case. See, Jersey Land & Development Co. v. United States,539 F.2d 311, 315 (3d Cir. 1976); Suburban Realty Co. v. United States,615 F.2d 171 (5th Cir. 1980), cert. denied 449 U.S. 920 (1980). By 1971 petitioner had already been engaged in the thoroughbred horse business for three years. He used a nominee to purchase the horse so that, as he explained, he would not become known as an agent who "keeps the best and sells the rest". This hidden ownership is inconsistent with the promotional goals petitioner claims he had. Petitioner sold the *379 horse approximately 8 months after he repurchased it. Property held by a taxpayer primarily for sale to customers in the ordinary course of his business or property which is properly included in a taxpayer's inventory is not included in the definition of a capital asset. Section 1221(1). The statute defining capital assets was meant to be read literally. See Malat v. Riddell,383 U.S. 569 (1966). We find that Jim French was property being held by petitioner primarily for sale to customers in the ordinary course of his business, therefore it does not qualify as a capital asset under section 1221. The gain realized by petitioner on the sale of the horse is ordinary income and does not qualify for capital gain treatment. Brown v. Commissioner,54 T.C. 1475, 1488 (1970), affd. 448 F.2d 514 (10th Cir. 1971). Since we hold that petitioner purchased this horse for sale in the ordinary course of his business, we need not address petitioner's argument that the horse qualifies for treatment under section 1231. We note, however, that this case is distinguishable from our holding in Gamble v. Commissioner,68 T.C. 800 (1977). In Gamble, the taxpayer, who primarily raced thoroughbred horses *380 but sold a colt at a substantial profit, was entitled to treat the gain realized as capital gain under section 1231(a) because the colt was not held primarily for sale in the ordinary course of his business. The colt was property used in the taxpayer's horse racing business and was treated in exactly the same manner as all of his other horses. In the present case, the fact that petitioner also raced the horse does not remove it from its status as property held for sale. Indeed, petitioner admits that he often raced his horses to increase their sales potential. Cf. Duval Motor Co. v. Commissioner,264 F.2d 548 (5th Cir. 1959), affg. 28 T.C. 42 (1957) (cars used by auto sales company executives for personal use and as demonstrators were nevertheless held primarily for sale to customers). Petitioner must treat this horse in the same manner as the other horses he held. As respondent correctly points out, the fact that Jim French turned out to be a champion does not alter its status for tax purposes. [27] *381 Theft Loss
In September of 1971, petitioner and Cole returned to the bank where they had deposited the proceeds from the Jim French sale and withdrew a substantial amount of cash from the account. Petitioner took the cash about $120,000, back to his house at 1 Ripley Lane. He carried the cash in a red square attache case and was assisted by his employee Carmine Calabro (hereinafter Calabro). Calabro worked for petitioner for approximately one year; he began his employment in October of 1970. He performed a variety of duties from household help to chauffeur; his salary was $225 per week. Calabro helped carry the $120,000 into the house and saw petitioner count the money. Calabro burglarized petitioner's home on October 4, 1971. After reading a newspaper story which reported that $120,000 had allegedly been stolen from the house, Calabro confessed that he had burglarized the house. He admitted that he stole various items of personal property from the house, such as perfume, jewelry, and clothing, but he denies *382 having taken the $120,000. The robbery was discovered by Anna Manzi, petitioner's aunt, who was residing at petitioner's residence during this period. The $120,000 was reported missing at the time the police report was made. Further Findings and Analysis
Petitioner claims he is entitled to a theft loss deduction under section 165 for the $120,000 which he claims was stolen by Calabro. On his Federal income tax return for 1971, petitioner claimed a theft loss of $135,600. This amount covered $120,000 in cash allegedly stolen, as well as the value of the other stolen articles. In the statutory notice of deficiency respondent disallowed the $120,000 theft loss deduction. Section 165(a) allows a deduction for any theft loss sustained during the taxable year which is not compensated for by insurance or otherwise.A theft loss is treated as sustained during the taxable year in which the taxpayer discovers the loss. The burden of proving both the existence and the amount of the theft is on petitioner. Allen v. Commissioner,16 T.C. 163 (1951); Elliott v. Commissioner,40 T.C. 304 (1963); Rule 142(a). Several witnesses testified that there was a large amount of cash in the house around *383 the time of the burglary. No witness, except petitioner, could say where the cash was or how much cash was on hand. Moreover, petitioner made several payments in cash around the time of the Jim French sale which could indicate that the cash at the house must have been somewhat depleted. Petitioner claims he paid a commission of $150,000 in cash to Paul Arnold; he paid $5,000 in cash to Fred Cole for his part in the Jim French sale; he paid $9,000 in cash to purchase a Cadillac, and he paid $20,000 in cash for a Rolls Royce. Calabro turned himself into the police and confessed that he had committed the burglary, but denied taking the cash. He was placed on probation and eventually the charges were dismissed. We find Calabro to be a credible witness and his testimony convincing. Given his testimony that he was on welfare for the years following the robbery, and that he lived in a rooming house, we are not convinced that Calabro had a cache of $120,000 anywhere. We are not satisfied that petitioner has met his burden of proof here. Petitioner's testimony on the theft is self-serving, and the testimony of the other witnesses lacks specificity. We need not accept a witness' testimony *384 where it is "improbable, unreasonable, or questionable." Archer v. Commissioner,227 F.2d 270, 273 (5th Cir. 1955), affg. a Memorandum Opinion of this Court dated Feb. 18, 1954; Banks v. Commissioner,322 F.2d 530, 537 (8th Cir. 1963). The only other corroborating evidence of the theft was a copy of the list of items which petitioner reported stolen. We are not inclined to accept the police report as an accurate statement of what was stolen since it was petitioner who supplied the information to the police. [28]
The proof offered by petitioner does not reasonably lead us to the conclusion that petitioner suffered a theft loss in the amount claimed during the year. Even if we were inclined to believe that the money was actually in the house, we cannot find from all of the circumstances that Calabro stole the money. Petitioner offered no other theory or proof to verify the theft loss. Therefore he is not entitled to this deduction. Allen v. Commissioner,supra.
Horse and Other Transactions
In 1971 petitioner's main occupation was the thoroughbred horse business. In 1971 petitioner's gross receipts, per his Schedule C, amounted to $565,471. *385 The gross receipts can be broken down into winnings of $195,221 and gross sales realized from the sale of horses in the amount of $370,250. The horse transactions reported by petitioners on their Schedule C for 1971 are as follows: Horse
Cost
Sale Price
Run for Candy
$5,000
$2,500
Change of Scenery
20,000
5,000
Edie's Image
40,000
75,000
Northern Dancer
22,000
7,000
Commoner
95,000
100,000
Prince Graustark
95,000
Ribo Star
33,000
15,000
Heist
32,000
20,000
Pax En Terra
2,500
40,000
La Fa Buleux
17,500
5,000
Hail to Reason
30,000
60,000
Otesaga
2,760
4,500
Raise a Native
Breeding Right
7,500
25,000
Raise a Native
Breeding Right
7,500
11,250
Ribo Season [29]
15,750
Native Trap
1,250
Inventory
Ridan Filly Weanling
7,300
Inventory
Gallant Man
25,000
Inventory
Fleet Nasrullah Filly
22,000
Inventory
Graustark Weanling
33,000
Inventory
Petitioner later filed an amended return for 1971 reflecting his use of the accrual *386 method of accounting. The amended return reduced the cost of goods sold from 1971 from $557,560 to $433,010. A $95,000 adjustment reflected the cost of acquiring the horse Prince Graustark. During 1971 petitioner received $60,000 in insurance proceeds for the death of the horse Hail to Reason/My Sore. Petitioner reported this amount on his 1971 income tax return. The cost of the horse was listed in accountant Manzi's workpapers as $30,000, yet $15,000 of the purchase price was paid by postdated check. This check was returned unpaid to Wilson. In addition, petitioner's gross receipts reflected none of the following items: $15,000 received for sale of 5 percent interest of Jim French to Wilson; the value of the benefit realized by conveyance of 5 percent interest in Jim French to Caldwell; the sale of three separate 5 percent interests in Jim French to Wilson for $20,000, $25,000 and $15,000 during 1970 and 1971; or the sale in 1970 of two 5 percent interests in Jim French to Mario Biundo for $10,000 each. Petitioner also left out of his 1971 income tax return the amount he received as a result of the sale of 50 percent interest of Rule by Reason; this amounted to $22,500. The *387 purchase price was $21,500. Nor did petitioner include the sale in 1971 of two breeding shares in Jim French of $25,000 each. Petitioners are entitled to the following increased costs in connection with certain horse sales reflected on their 1971 return: Cost per
Cost Per
Increased
Horse
Return
Stipulation
Cost
Run for Candy
$5,000
$20,000
$15,000
North Star
Dancer
22,000
24,000
2,000
Prince Graustark
95,000
99,000
4,000
Ribo Star
33,000
35,000
2,000
Pax En Terre
2,500
30,000
27,500
Heist
32,000
40,000
8,000
Otesaga
2,760
3,313
553
In December of 1971 Anthony Manzi, petitioner's uncle, received $70,750 from petitioner and deposited the money into his personal checking account. Manzi then purchased three horses from Darby Dan Farms in the name of petitioner. The gross sales price of the horses equaled $70,750. Auto Purchases
In 1971 petitioner, using the name Bob Manzi, purchased two cars from Atherton Cadillac in West Islip, Long Island. In January he purchased the first one. The car was picked up by a woman named Anna Manzi who paid for the car in cash. The total cash paid was $8,950. Anna Manzi, petitioner's aunt, does not have a driver's license and cannot drive. She had, however, given her nephew, petitioner, *388 permission to use her name whenever he felt it was necessary. In September of 1971 petitioner bought a 1972 Cadillac from the same dealership. This time he bought the car in the name of Anthony Manzi and the $8,800 purchase price was paid in cash. Finally, in September, petitioner, using the name Robert Presti, bought a Silver Shadow Rolls Royce from Ralley Motors, Inc. The car was sold to the Happy Hermit Farms and was paid for with $5,000 in cash and a $15,000 certified check. Banking Transactions
During the year petitioner made net deposits in the amount of $164,023.57 to checking account number XXX-X9428 at the Security National Bank.Additionally, during 1971, Fred Cole, acting as nominee for petitioner made deposits to account number XXX-X0911 at the Hempstead Bank in Oyster Bay, Long Island. These deposits were made at the direction of petitioner. Petitioner, himself, made deposits to the account in the following amounts: Date
Amount
02/22/71
$1,500.00
03/16/71
5,000.00
03/29/71
10,200.00
04/08/71
3,015.00
04/12/71
53,200.00
05/17/71
15,767.50
05/19/71
50,000.00
05/19/71
30,000.00
05/20/71
20,000.00
05/27/71
50,000.00
05/27/71
100.00
06/03/71
50,000.00
Fred Cole also acted as nominee for petitioner *389 when he opened a checking account in the name of Happy Hermit Stables, Inc., at the Security National Bank. account number XXX-X9415. During 1971 the following deposits were made to this account. Date
Amount
05/20/71
$200.00
05/28/71
9,160.00
06/07/71
1,000.00
06/07/71
5,000.00
06/09/71
23,900.00
06/10/71
4,000.00
06/15/71
70,000.00
07/14/71
4,000.00
07/15/71
10,000.00
07/26/71
330.60
08/06/71
80,000.00
08/18/71
120,000.00
08/31/71
2,000.00
09/14/71
500.00
10/05/71
18,000.00
10/15/71
18,000.00
Further Findings and Analysis
The first issue we address concerns the horse Prince Graustark. Petitioner purchased the horse from H. C. Savin, and paid for it by two checks totaling $70,000, a breeding share in Jim French valued at $25,000 and a $4,000 commission paid to Gene Rosen. Petitioner bought the horse on May 14, 1971 and it died on July 9, 1971. The horse was insured by Livestock Underwriters, Inc. for $125,000. Petitioner claims that the parties have stipulated that when this horse died petitioner incurred a loss of $99,000, and, therefore, respondent cannot now dispute that characterization. We do not agree that this is what the parties have stipulated to. The parties have merely stipulated to the purchase *390 price of the horse and the date of his death. In view of the conflicting evidence offered, the first issue for decision is whether petitioner suffered a $99,000 loss on the death of Prince Graustark or whether petitioner actually sold the horse to Caldwell for $125,000 and must accrue this amount in income. After sifting through conflicting evidence, we find that petitioner was the true owner of Prince Graustark, and that once again, Caldwell was merely petitioner's nominee. This finding, however, does not resolve the issue of the tax treatment of the death of the horse. Respondent argues that even if we find that petitioner actually owned the horse, and we do so find, petitioner still may not deduct any loss for 1971 because petitioner had a reasonable prospect of recovery against the insurance company. Section 165(a) allows a loss deduction for any loss incurred during the taxable year which is not compensated for by insurance or otherwise. The loss must be the result of a closed and completed transaction, and will not be allowed if there is a reasonable prospect of recovery. See Ramsay Scarlett & Co. v. Commissioner,61 T.C. 795 (1974), affd. 521 F.2d 786 (4th Cir. 1975); Sec. 1.165-1(d)(2)(i), Income Tax Regs. *391 [30] Determining that a taxpayer had a claim for reimbursement that provided a reasonable prospect for recovery is an objective inquiry requiring an examination of facts and circumstances surrounding the deduction. Boehm v. Commissioner,326 U.S. 287 (1945). Petitioner filed suit in 1973 against Caldwell and Livestock Underwriters and claimed that he was entitled to the entire $125,000 insurance proceeds. The fact that he filed the suit, even after he claimed the theft loss, gives rise to the *392 inference that he believed a reasonable prospect of recovery existed and that he did not consider his loss to be a closed and completed event. See Dawn v. Commissioner,675 F.2d 1077, 1078 (9th Cir. 1982), affg. T.C. Memo. 1979-479. Petitioner argues that there was no likelihood of his recovering anything as a result of his suit, and relies on Parmelee Transportation Co. v. United States,351 F.2d 619 (Ct.Cl. 1965) to support his claim. It is true that the mere fact of filing a law suit will not postpone the year of reduction, especially if the chance of success in the suit is unlikely. Ramsay Scarlett & Co. v. Commissioner,supra, at 811-812. The burden of establishing that no reasonable prospect of recovery existed lies with petitioner. National Home Products, Inc. v. Commissioner,71 T.C. 501 (1979). Petitioner offered no explanation at trial as to why his suit was futile; rather he indicated that he abandoned the claim because he ran out of money. On brief petitioner argues that his claim was too remote to succeed but he offered no proof at trial that this was true. We believe that the reasonable inference from petitioner's suit is that a reasonable prospect of recovery did *393 in fact exist, and this is not an instance in which a law suit carried only a possibility, not a probability, or recovery. See Parmelee Transportation Co. v. Commissioner,supra at 628. Petitioner also argues that he is entitled to add $12,000 to the cost of goods sold for 1971 because he refunded this amount to George Steinbrenner. In August of 1970 petitioner sold Steinbrenner one stallion cover [31] to the stallion Prince Graustark with the stipulation that if a live foal were not produced within a specified period of time, petitioner would refund Steinbrenner's money. Since no live foal was produced in 1971 petitioner refunded the $12,000 to Steinbrenner. Petitioner reported no income from horse transactions during 1970. The parties have not stipulated that petitioner must recognize this $12,000 in income for 1970, nor does respondent charge petitioner with receipt of the income for the year. It is axiomatic that something cannot be subtracted from nothing. Petitioner *394 is not entitled to a loss deduction now because petitioner never took this money into income. Gertz v. Commissioner,64 T.C. 598, 600 (1975); Collin v. Commissioner,1 B.T.A. 305, 309 (1925); W.L. Moody Co. v. Commissioner,143 F.2d 712 (5th Cir. 1944). [32]
Petitioner also claims a cost of goods sold deduction for a portion of the purchase price of the horse Hail to Reason/My Sore. Petitioner purchased this horse from Wilson. Petitioner included $30,000 in cost of goods sold for this horse. Part of that $30,000, however, was a check dated November 16, 1971. This check was one of the series of post dated checks petitioner gave to Wilson. This check was returned unpaid after Wilson deposited it; it was drawn on the checking account which petitioner closed in October of 1971. Petitioner is not entitled to a cost of goods sold deduction for the $15,000 post dated check given to Wilson as part of the purchase price. This horse should be treated no differently than the other horses petitioner bought from Wilson with the post dated checks. Petitioner cannot include the $15,000 check in his cost basis of the horse. See our discussion, *395 infra.
With regard to some of petitioner's other horse transactions, respondent argues that petitioner understated the sales prices of two of the horses he sold during the year. The first of these two horses is Pax En Terra. On his 1971 return petitioner reported the sales price of this horse as $40,000. Petitioner agrees that this sales price is inaccurate. Respondent argues that petitioner sold 50 percent of the horse to Biundo for $60,000 and the other 50 percent was sold to Caldwell for $80,000. Petitioner agrees that 50 percent was sold to Biundo for $60,000, however, petitioner argues that he sold the remaining 50 percent to Caldwell for only $40,000. At trial Caldwell testified that he paid petitioner $80,000 for the interest in the horse. Petitioner testified that he sold the 50 percent to Caldwell for only $40,000. Caldwell's testimony is corroborated by petitioner's prior testimony recorded during an Examination Before Trial taken in connection with a suit brought by Biundo against Caldwell, petitioner, et al. During that examination petitioner testified that he did indeed sell the interest for $80,000 to Caldwell. Since petitioner has come forward with no other evidence *396 except his self-serving testimony, we find that petitioner sold the horse Pax En Terra for $140,000. The next horse to consider is North Star Dancer. Petitioner argues that the sales price for this horse was $7,000; respondent argues that it was $24,000. The parties agree that 50 percent of the horse was sold to Caldwell for $2,000. They disagree on the amount of the purchase price paid by Dr. Gottdank. Gottdank testified that he paid petitioner $22,000 for his 50 percent share of the horse. He testified that he paid $5,000 by check and the balance of the amount due was paid by Gottdank performing dental services for the LiButti family. Petitioner offered evidence that the true sales price was $5,000. He offered a bill of sale as well as his accountant's work papers reflecting the price and his own testimony. We cannot accept Gottdank's testimony. There was no documentation of the services performed or the patients treated. While the ages of petitioner's children were not introduced, it seems unlikely that no matter what their ages, Gottdank could have performed $17,000 worth of dental work on a family of four over the course of one or two years. Indeed, Gottdank testified *397 that he performed more than $17,000 worth of work. We find this testimony unbelievable. Based on the evidence presented we find that the true sales price of North Star Dancer was $7,000 and that Gottdank actually paid $5,000. Respondent also charges petitioner with income from horse winnings in the amount of $195,220. This amount includes $185,770 in purse winnings from Jim French. The parties have stipulated that petitioner must recognized this amount. The remaining $9,450 is broken down as follows: $9,000 earned by Prince Graustark and $450 by Heist. Petitioner argues that the parties have stipulated that the only income from purses which petitioner must recognize is the $185,770 from Jim French. Petitioner argues that unless the stipulation is clearly contrary to the evidence then it is controlling, and he relies on Jasionowski v. Commissioner,66 T.C. 312 (1976); Ball v. Commissioner,T.C. Memo. 1984-218; Cally v. Commissioner,T.C. Memo. 1983-203; Rule 91(e). We disagree with petitioner's interpretation of the stipulation. The stipulation which mentions the amount $185,770 relates only to the earnings won by Jim French during 1971. The stipulation is not broad enough to *398 encompass purse winnings from all horses. Therefore respondent is entitled to present evidence to support his determinations that petitioner received increased amounts from purse winnings. Petitioner next argues that because the amount sought by respondent at trial is larger than the amount determined in the statutory notice of deficiency respondent is not entitled to the increased deficiency. On June 14, 1984, respondent filed with the Court his Motion for Leave to File Amendment to Answer to Conform the Pleadings to the Proof. We granted respondent's motion on June 25, 1984. In his amended answer respondent alleged that petitioner had additional income of $9,450 from purse winnings which he did not report as income. Under section 6214(a) we may determine an increased deficiency. Here, respondent, by way of his amended answer, has formally pleaded an increase in the 1971 deficiency. Respondent bears the burden of sustaining the affirmative allegations in his amended answer. Beck Chemical Equipment Corp. v. Commissioner,27 T.C. 840, 856 (1957); Jasionowski v. Commissioner,supra at 318. Respondent's proof to support the increased deficiency was petitioner's 1971 return and Manzi's *399 work papers compiled when Manzi prepared petitioner's 1971 return. This is insufficient to meet respondent's burden of proof. Respondent cannot rely on Manzi's work papers when they support increased taxes and disregard them when they do not. Respondent has not sustained his burden of proof, therefore, we do not find petitioner liable for the amount of the increased deficiency. Addition to Tax for Fraud Under Section 6653(b)
We must now determine whether or not any part of the underpayment of tax for the taxable years 1968 through 1971 were due to fraud. Respondent bears the burden of proving fraud by clear and convincing evidence. Miller v. Commissioner,51 T.C. 915 (1969); Section 7454(a); Rule 142(b). Respondent's burden of proof may be met by the use of circumstantial evidence. Gajewski v. Commissioner,67 T.C. 181, 200 (1976), affd. without published opinion 578 F.2d 1383 (8th Cir. 1978). Evidence of conduct intended to conceal, mislead, or otherwise prevent the collection of taxes resulting in an underpayment of tax is sufficient. Stoltzfus v. Commissioner,398 F.2d 1002, 1004 (3d Cir. 1968), cert. denied 393 U.S. 1020 (1969); Acker v. Commissioner,26 T.C. 107 (1956). *400 Respondent must establish fraud for each taxable year for which he seeks to assert the addition under section 6653(b). Professional Services v. Commissioner,79 T.C. 888, 930 (1982); Otsuki v. Commissioner,53 T.C. 96, 105 (1969). The existence of the requisite fraudulent intend for each year must generally be determined by surveying a taxpayer's entire course of conduct. Stone v. Commissioner,56 T.C. 213, 220 (1971); Stratton v. Commissioner,54 T.C. 255, 284 (1970). Petitioner, Robert LiButti
1968 and 1969
With respect to the deficiency for the taxable year 1968 we have sustained respondent's determination as to only one transaction, that is, that petitioner had a gain on the sale of the horse Sweet Music in the amount of $1,025. The basis for this finding was that petitioner failed in his burden of proof. With respect to the taxable year 1969 respondent determined that petitioner received taxable income as a result of three transactions. Our findings with respect to the deficiency herein are that petitioner failed in his burden of proof to establish that he paid a commission which would offset the income received from these three transactions. Respondent, to this extent, cannot *401 meet his burden of proof with respect to fraud simply because petitioner failed to discharge his burden of proof with respect to the underlying deficiencies. Otsuki v. Commissioner,supra at 106; Pigman v. Commissioner,31 T.C. 356, 370 (1958). [33] While respondent has argued that petitioner's course of conduct and the "common thread" extends to all of the years in issue, we are unconvinced that the substantial evidence of fraud relied on by respondent for the taxable years 1970 and 1971 is applicable to the years 1968 and 1969. Based upon the entire record we do not believe that petitioner had the fraudulent intent to underpay his tax for the taxable years 1968 and 1969 1970 and 1971
Respondent presented substantial evidence that a part of the underpayments of tax was due to the fraud of petitioner for these years. [34] *403 The findings that we have made herein with respect to respondent's deficiency determination also support the fraud addition. The indicia of fraud are as follows: Petitioner did not maintain accurate books and records with respect to income and expenses. Otsuki v. Commissioner,supra at 109. Petitioner attempted *402 to mislead and or conceal his true activities during these years. Petitioner accomplished this by the use of fictitious identities, nominees, different addresses, and large amounts of cash. Chinn v. United States,228 F.2d 151 (4th Cir. 1955); United States v. Rifkin,451 F.2d 1149 (2d Cir. 1971). As pointed out by respondent, the activities of petitioner first came to public attention in the summer and fall of 1971. It was in August of 1971 when Frank Caldwell testified before the New York State Racing Commission and in the fall when publicity in magazines and newspapers indicated petitioner's involvement in the horse racing business. It was after this time (April 1972) that petitioner first acknowledged in a return that he bought and sold horses. Respondent has established for these two years that petitioner omitted large amounts of income which should have been reported in his income tax returns. Petitioner provided no reasonable explanation for these omissions. Such omissions support an inference of fraudulent conduct. Holland v. United States,348 U.S. 121 (1954). Accordingly, we are satisfied that a part of the underpayments of tax for the taxable years 1970 and 1971 are due to the fraud of Robert LiButti. Petitioner Joan LiButti
1968 through 1971
Respondent also has the burden of estabilishing by clear and convincing evidence that part of the underpayment was due to the fraud of Joan LiButti. Section 6653(b)(4) and section 7454(a); Drieborg v. Commissioner,225 F.2d 216, 218 (6th Cir. 1955). [35] We believe that respondent has not satisfied his burden in this regard. While respondent alludes in his brief to a few circumstances of petitioner Joan LiButti's participation in the fraudulent omission of income, we do not believe that the record clearly and convincingly establishes *404 fraudulent acts by her. There is no evidence that she participated in buying and selling of horses or in the horse racing business. While she may have had knowledge of some of her husband's activities during these years there is no evidence to link her to knowledge of the income. We will not make such an assumption. Respondent argues that a negative inference should be drawn in her failure to testify in this case. [36] Respondent is mistaken on this point. Since the burden of proof is on respondent, not petitioner, the failure of Joan LiButti to testify would only be relevant if respondent and presented a prima facie case. Respondent has not done so. Accordingly, we hold that no part of the underpayment of tax for the taxable years 1968 through 1971 is due to the fraud of petitioner Joan LiButti. Innocent Spouse under Section 6013(e)
Petitioner Joan LiButti claims that with respect to the taxable year 1970 she is an innocent spouse within the meaning of section 6013(e). [37] *406 Petitioner has the burden of establishing *405 that the elements of innocent spouse have been satisfied. Petitioner has not met her burden. Assuming arguendo, that the first two criteria have been met, that is, that a joint return has been made and that there is a substantial understatement of tax attributable to grossly erroneous items of one spouse, petitioner Joan LiButti has not satisfied the remaining two tests. Adams v. Commissioner,60 T.C. 300 (1973). Testimony by petitioner Joan LiButti or other evidence was not presented which might have established whether she did not know or had no reason to know that there was a substantial understatement. Further, without such testimony we can not determine whether it is inequitable to hold petitioner Joan LiButti liable for the deficiency. Petitioner Joan LiButti's failure to testify in this regard is critical. Sonnenborn v. Commissioner,57 T.C. 373, 383 (1971). Petitioner Joan LiButti failed in her burden of proof to establish that she qualifies as an innocent spouse. [38]
Statute of Limitations - 1968 through 1970
Petitioners have alleged that the statute of limitations expired for the years 1968 through 1970. Respondent agrees that the statute of limitations is barred for the taxable years 1968 and 1969 if fraud is not found. Accordingly, *407 in view of our finding herein, the assessment of any deficiency for the taxable years 1968 and 1969 is barred by the statute of limitations. With respect to 1970, since we have found that a part of the underpayment of tax is due to fraud of petitioner Robert LiButti, the statute is open for assessment of any deficiency under section 6501(c)(1). [39]Vannaman v. Commissioner,54 T.C. 1011, 1018 (1970). Decision will be entered for petitioners in Dkt. No. 5977-75.Decision will be entered under Rule 155 In Dkt. Nos. 6289-77 and 547-79.
Footnotes
1. All section references are to the Internal Revenue Code of 1954, as amended, unless otherwise indicated.↩
2. After trial, respondent filed a motion with the Court, based upon evidence introduced at trial, for leave to amend his answer to claim an increased deficiency and addition under section 6653(b) for 1971. This motion was granted and respondent's amendment to answer was filed claiming a deficiency in the amount of $509,383.36 and addition to tax under section 6653(b) in the amount of $254,691.69.
3. To the extent that transactions overlap different years discussion of those facts will necessarily be included.↩
4. All Rule references are to the Tax Court Rules of Practice and Procedure.↩
5. Since we find that petitioner did not meet his burden of proof on this issue, we do not address his argument that the commission, if paid, should be added to the cost of the horses.↩
6. We note that Caldwell, at trial, was extremely evasive in answering questions on cross-examination; he had a selective, entirely suspect, recall of the details of the transaction on cross-examination which he did not exhibit on direct examination. While we are required to make some findings of fact with respect consider Caldwell's testimony to be highly suspect and untrustworthy.↩
7. Petitioner's swap of Strider for Sea Pac qualifies as a "like-kind" exchange, and results in no recognition of gain or loss under sec. 1031(a).↩
8. See also Rodman v. Commissioner,T.C. Memo. 1973-277, affd. 542 F.2d 845↩ (2d Cir. 1976). 9. Rodman v. Commissioner,supra.↩
10. Sec. 1.461-1(a)(2), Income Tax Regs., provides that under an accrual method of accounting: (1) An expense in deductible for the taxable year in which all the events have occurred which determine the fact of the liability, and (2) the amount of the liability can be determined with reasonable accuracy. ↩
11. But see sec. 461(f). The issue before us in this case does not concern the applicability of sec. 461(f).↩
12. See Webb Construction Co. v. Commissioner,T.C. Memo. 1981-742↩.
13. Both respondent and petitioner have attempted to prove their cases by an analysis of deposits made to petitioner's various checking accounts. However, this analysis neither proves nor disproves that petitioner actually received the unreported income. Given petitioner's poor recordkeeping, and his demonstrated commitment to insulating himself from these transactions, it would be unlikely that the checking account analysis would show when and if petitioner deposited the funds to his account.
14. See also Clarkston v. Commissioner,T.C. Memo. 1958-91↩.
15. Respondent argues that because petitioner did not introduce the order of dismissal in his suit against Caldwell that we should infer that the prior case was dismissed for lack of prosecution. Respondent argues further that this negative inference should lead to the conclusion that the dismissal was a judgment on the merits. We note that, under New York law, generally a dismissal for lack of prosecution is not an adjudication on the merits, unless so specified in the court's order of dismissal. See Lesser v. Migder,328 F.2d 47 (2d Cir. 1964); cf. Harl v. City of La Salle,679 F.2d 123, 126 (7th Cir. 1982) (Federal court must give State judgment same res judicata effect as would be provided by State court). Since we have found that petitioner has not proved a valid debt existed, we will not address respondent's collateral estoppel argument.
16. See discussion of this issue infra.↩
17. In addition to the expenses listed, petitioner paid Olin Gentry $30,000 in interest which the parties agree is deductible for 1970. ↩
18. This amount represents claimed expenses for 1970 and 1971. For the sake of brevity we will examine in one analysis the expenses claimed for both of these years. ↩
19. In addition to the expenses listed, petitioner claimed on brief that he is entitled to a home office deduction for both 1970 and 1971. He specified no amount as a deduction. See our discussion infra.↩
20. On brief, respondent conceded that a portion of petitioner's telephone costs may have been business related.↩
21. See also Frick v. Commissioner,T.C. Memo. 1983-733; Smith v. Commissioner,T.C. Memo. 1982-546. This case does not involve a deduction for the monthly service charge which we disallowed in our recent opinion of Kessler v. Commissioner,T.C. Memo. 1985-254↩.
22. See Haman v. Commissioner,T.C. Memo. 1972-118, affd. as to this issue 500 F.2d 401↩ (9th Cir. 1974).
23. See also Stice v. Commissioner,T.C. Memo. 1980-14↩.
24. See also Stice v. Commissioner,supra at n.23; Schmoutey v. Commissioner,T.C. Memo. 1979-142; Gee v. Commissioner,T.C. Memo. 1977-72↩.
25. Even if we were to consider the home office deduction, there is not sufficient evidence before us to establish such a deduction.↩
26. In order to substantiate that the $150,000 commission expense was incurred petitioner attempted to place in evidence a handwritten statement signed by Paul Arnold acknowledging receipt of the payment. Respondent objected to its admissibility. The parties presented extensive argument with respect to the admissibility of this document. The Court reserved decision and the parties briefed the admissibility issue. Because of our finding herein we do not need to directly address this evidentiary question.↩
27. Petitioner and respondent also agree that petitioner must recognize the gain on his sale of breeding shares in Jim French to H.C. Savin and Mrs. Harry Love. The proper treatment of these sales as well as petitioner's sale of his 50 percent interest in Rule by Reason has been stipulated, therefore we need not address ourselves to these transactions.
28. See Lee v. Commissioner,T.C. Memo. 1982-35↩.
29. At trial petitioner contended that he was entitled to a deduction in the amount of $15,750 for a breeding season in Ribo.Petitioner now concedes, and respondent agrees, that respondent has already allowed this expense. The cost is properly added to the cost of goods sold during the year, and has already been included in that amount.↩
30. Sec. 1.165-1(d)(2)(i), Income Tax Regs., states in part: (2)(i) If a casualty or other event occurs which may result in a loss and, in the year of such casualty or event, there exists a claim for reimbursement with respect to which there is a reasonable prospect of recovery, no portion of the loss with respect to which reimbursement may be received is sustained, for purposes of section 165, until it can be ascertained with reasonable certainty whether or not such reimbursement will be received. Whether a reasonable prospect of recovery exists with respect to a claim for reimbursement of a loss is a question of fact to be determined upon an examination of all facts and circumstances. * * *↩
31. Cover is a breeding term which means that, while mating, the stallion actually covers the mare. The term is used to indicate that the horses actually copulate as opposed to the artificial insemination of the mere.↩
32. See also Carroll v. Commissioner,T.C. Memo. 1981-347↩.
33. See also Pappas v. Commissioner,T.C. Memo. 1981-639↩.
34. Despite petitioner's conviction for violating section 7206(1) with respect to the taxable year 1970, respondent did not rely on the doctrine of collateral estoppel to prove fraud for 1970. As the Court recently held, a taxpayer's conviction under section 7206(1) does not collaterally estop the taxpayer from denying that any underpayment of tax for the year in issue was due to fraud within the meaning of section 6653(b). Wright v. Commissioner,84 T.C. 636 (1985)in which we expressly overruled our prior holdings in Goodwin v. Commissioner,73 T.C. 215 (1979) and Considine v. Commissioner,68 T.C. 52↩ (1977).
35. See also Flynn v. Commissioner,T.C. Memo. 1981-491; Nell v. Commissioner,T.C. Memo. 1982-228↩.
36. Respondent cites Sonnenborn v. Commissioner,57 T.C. 373, 383↩ (1971).
37. Sec. 6013(e) was amended by section 424 of Pub. L. 98-269, 98 Stat. 801, 802. The section as amended applies to all tax years. This section as amended provides as follows: * * * (e) SPOUSE RELIEVED OF LIABILITY IN CERTAIN CASES.- (1) IN GENERAL.-Under regulations prescribed by the Secretary, if (A) a joint return has been made under this section for a taxable year, (B) on such return there is a substantial understatement of tax attributable to grossly erroneous items of one spouse, (C) the other spouse establishes that in signing the return he or she did not know, and had no reason to know, that there was such substantial understatement, and (D) taking into account all the facts and circumstances it is inequitable to hold the other spouse liable for the deficiency in tax for such taxable year attributable to such substantial understatement, then the other spouse shall be relieved of liability for tax (including interest, penalties, and other amounts) for such taxable year to the extent such liability is attributable to such substantial understatement. * * * ↩
38. See also Quave v. Commissioner,T.C. Memo. 1985-7↩.
39. Based on this finding we need not address the question of whether or not a timely notice of deficiency was issued satisfying the 3-year statute under section 6501(a).↩